# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| CORE WIRELESS LICENSING S.A.R.L., | § § § | Case No. 2:14-cv-0911-JRG-RSP (lead) |
| vs. | § § | |
| LG ELECTRONICS, INC., AND LG ELECTRONICS MOBILECOMM U.S.A., INC. | § § § § | Case No. 2:14-cv-0912-JRG-RSP (consolidated) |

## MEMORANDUM OPINION AND ORDER REGARDING THE GROUP 3 PATENTS

On September 3, 2015, the Court held a hearing to determine the construction of disputed terms in the five United States Patents: Patent Nos. 5,907,823 ("the '823 Patent"), 7,072,667 ("the '667 Patent"), 8,434,020 ("the '020 Patent"), 8,498,671 ("the '671 Patent"), and 8,713,476 ("the '476 Patent") (collectively the "Asserted Patents"). The Court, having considered the parties' claim construction briefing (Dkt. Nos. 120, 140 and 146)[1] and their arguments at the hearing, issues this Memorandum Opinion and Order Regarding Group 3 Patents construing the disputed terms.

## BACKGROUND AND THE ASSERTED PATENTS

Core Wireless Licensing S.A.R.L. ("Core") brings two actions against LG Electronics, Inc. and LG Electronics Mobilecomm U.S.A., Inc. (collectively "Defendants").[2] The disputed

---

[1] Citations to docket numbers reference the docket numbers in Case No. 2:14-cv-0911.

[2] Originally four actions were consolidated for claim construction purposes. The other two actions were Core Wireless Licensing S.A.R.L. v. Apple Inc., Case No. 6:14-cv-751 and Core Wireless Licensing S.A.R.L. v. Apple Inc., Case No. 6:14-cv-752. The LG Defendants and Apple filed consolidated claim construction briefs. After the briefing, but prior to the claim construction hearing, the Apple actions were transferred out of this district.

terms in the two actions were grouped into three consolidated patent groupings for claim construction briefing and argument purposes. The patents in Group 3 are asserted by Core to not be standard-essential patents. This opinion and order relates to the Group 3 patents.

The Asserted Patents relate to cellular communication systems. In general, the '823 Patent relates to techniques for reducing the effects of noise on the quality of an audio signal. For example, the '823 Patent abstract recites:

> The invention relates to a method and a circuit arrangement for adjusting the level and/or dynamic range of an audio signal in a transmission system and particularly in a mobile station. According to the invention, the level of acoustic noise in the environment of a terminal (10, 12) and the level and noise level of a received signal are measured (123) and the level and/or dynamic range of the reproduced signal are adjusted (121, 122) according to the results from said measurements. The solution according to the invention helps reduce the effect of noise in the signal transmitted on the transmission channel (11) and of the acoustic noise in the environment of the terminal (12) on the intelligibility of the reproduced information.

'823 Patent Abstract.

In general, the '667 Patent relates to a location finding technique that is part of the cellular network rather than requiring registration with a third party location service. For example, the '667 Patent abstract recites:

> A cellular telecommunications network provides a location information service. A landmark location server (11) has an associated data store (12) of data concerning location information associated with individual cells of the network. The server (11) is responsive to a request for location information from a mobile station (MS1). The request is sent as a SMS through the network (PLMN1). The server (11) obtains location information from the data store (12) based on the cell (C1) occupied by MS1 or another mobile station (MS2). The network is configured to send the location information as a SMS to the mobile station (MS1) that requested the information, without having to pre-register the mobile station for the location information service.

'667 Patent Abstract.

In general, the '020 Patent and its continuation '476 Patent relate to user interface techniques for accessing various functions of a mobile device application. An application summary window for an application may be selected which allows for selection of commonly used functions without the need for launching the application. For example, the '020 Patent abstract recites:

> The present invention offers a snap-shot view which brings together, in one summary window, a limited list of common functions and commonly accessed stored data which itself can be reached directly from the main menu listing some or all applications. This yields many advantages in ease and speed of navigation, particularly on small screen devices.

'020 Patent Abstract.

In general, the '671 Patent relates to techniques for utilizing a mobile device's idle screen to display desired information. Displaying the information on the idle screen minimizes the need to engage in multiple navigation steps to obtain the desired information. For example, the '671 Patent abstract recites:

> The idle screen of a mobile telephone device is used to show updated information of a kind or from a source selected by a user (e.g. financial information, news, traffic etc.). Previously, the idle screen has been used to display the name of the network operator and alerting messages, such as '2 missed calls'. Placing information of interest to the user in the idle screen makes that information instantly accessible without the user having to navigate to the required function (e.g. a micro-browser) and select it.

'671 Patent Abstract.

## APPLICABLE LAW

### 1. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys.,*

*Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("Generally speaking, we indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning.")

The claims themselves provide substantial guidance in determining the ordinary meaning of claim terms. *Phillips*, 415 F.3d at 1314. "The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). First, a term's context in the asserted claim can be instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Phillips*, 415 F.3d at 1314. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is

dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent. *Id.* at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might

use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

### 2. Departing from the Ordinary Meaning

There are "only two exceptions to [the] general rule"[3] that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *Id.*

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Id.*

---

[3] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g.*, *CCS Fitness*, 288 F.3d at 1367.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.") "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### 3. Means-Plus-Function Limitations

The parties' disputed terms include alleged means-plus-function limitations. Where a claim limitation is expressed in "means-plus-function" language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112, ¶ 6. *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, 35 U.S.C. § 112, ¶ 6 mandates that "such a claim limitation 'be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.'" *Id.* (citing 35 U.S.C. § 112, ¶ 6). When faced with a means-plus-function limitation, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitation]." *Id.*

Construing a means-plus-function limitation involves multiple steps. "The first step . . . is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "[T]he next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function

recited in the claim." *Id.* The focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.* The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). However, § 112 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

For mean-plus-function limitations implemented by a programmed general purpose computer or microprocessor, the corresponding structure described in the patent specification must include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). The corresponding structure is not a general purpose computer but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

### 4. Claim Indefiniteness

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012). A party challenging the definiteness of a claim must show it is invalid by clear and convincing evidence. *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1345 (Fed. Cir. 2007).

The definiteness standard of 35 U.S.C. § 112, ¶ 2 requires that:

[A] patent's claims, viewed in light of the specification and prosecution history,
inform those skilled in the art about the scope of the invention with reasonable

certainty. The definiteness requirement, so understood, mandates clarity, while recognizing that absolute precision is unattainable. The standard we adopt accords with opinions of this Court stating that "the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter."

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129–30 (2014) (internal citations omitted).

## AGREED TERMS

The parties agreed to the following constructions prior to the oral hearing. Dkt. No. 162-1 at 1.

| '823 Patent Term | Agreed Upon Construction |
|---|---|
| "first audio signal (s1a)" / "first input signal (s1a)" (claims 1-3, 16-17, 20-21) | audio signal from a far-end terminal |

## TERMS NOT BEFORE THE COURT

After the September 3, 2015 hearing, Core provided an updated notice of asserted claims. As a result of such notice, certain terms that were subject to briefing and/or oral hearing are no longer contained in any asserted claim. The Group 3 terms that are no longer at issue are Term Numbers 5, 6, 7, 9, 10, 11, 28, 20, and 24.[4] Dkt. No. 178 at 4. This Order does not address those terms.[5]

## DISPUTED TERMS

I.      '823 Patent

1.      **Claim 20 Means Plus Function Terms (Terms 1-4)**

**"means (303) for measuring the level of the first audio signal (sla) to obtain a first measured value (p1)"  (Term 1)**

---

[4] As used herein, the term numbers reference the term numbers as used in the parties' claim construction briefing.
[5] The parties also no longer seek construction for Terms 16 and 17. Dkt. No. 140-9 at 6-9.

| Core Wireless's Construction | Defendants' Construction |
|---|---|
| **Function:** measuring the level of the first audio signal to obtain a first measured value<br><br>**Structure:** power measuring unit 303 as shown in Fig. 3, and statutory equivalents thereof | **Function**: measuring the level of the first audio signal (s1a) to obtain a first measured value (p1)<br><br><br>**Structure**: weighting filter **302** as described in 4:50-58 and Figure 3; and power measuring unit **303** as described in 4:50-52, 4:59-64, and Figure 3 |

**"means (303) for measuring the noise level in the first audio signal (sla) to obtain a second measured value (p2)" (Term 2)**

| Core Wireless's Construction | Defendants' Construction |
|---|---|
| **Function:** measuring the noise level in the first audio signal to obtain a second measured value<br><br>**Structure:** power measuring unit 303 as shown in Fig. 3, and statutory equivalents thereof | **Function**: measuring the noise level in the first audio signal (s1a) to obtain a second measured value (p2)<br><br>**Structure**: weighting filter **302** as described in 4:50-58 and Figure 3; power measuring unit **303** as described in 4:50-52, 4:59-64, and Figure 3; and known voice activity detector (VAD) unit **301** as described in 4:50-52, 4:64-5:7, and Figure 3. |

**"means (313) for measuring the noise level in said space to obtain a third measured value (p3)" (Term 3)**

| Core Wireless's Construction | Defendants' Construction |
|---|---|
| **Function:** measuring the noise level in said space to obtain a third measured value<br><br>**Structure:** power measuring unit 313 as shown in Fig. 3, and statutory equivalents thereof | **Function**: measuring the noise level in said space to obtain a third measured value (p3)<br><br>**Structure**: weighting unit **312** as described in 4:50-58, 5:10-13, 5:60-66, and Figure 3; power measuring unit **313** as described in 4:50-52, 4:59-64, 5:10-13, 5:60-66, and Figure 3; and VAD unit **311** as described in 4:63-5:7, 5:10-15, 5:60-6:3, and Figure 3 |

**"means (304, 306) for adjusting the level and/or dynamic range of the first audio signal (sla) in accordance with said first, second, and third measured values (p1, p2, p3)" (Term 4)**

| Core Wireless's Construction | Defendants' Construction |
|---|---|
| **Function:** adjusting the level and/or dynamic range of the first audio signal in accordance with said first, second and third measured values | **Function:** adjusting the level and/or dynamic range of the first audio signal (s1a) in accordance with said first, second and third measured values (p1, p2, p3) |
| **Structure:** adjusting unit 304 and multiplier 306 as shown in Fig. 3, and statutory equivalents thereof | **Structure**: adjusting unit **304** as described in 5:2-9, 5:15-20, 5:36-48 ("a processor," "a memory," and "a parameter table," "whereby the memory permanently stores the parameter table"), and Figure 3; delay unit **305** as described in 5:29-30 ("a shift register") and Figure 3; and multiplier **306** as described in 5:21-24 and Figure 3 |

The parties dispute whether the reference numbers should be included in the functions. The parties also have conflicting positions for the structure for each term.

**Positions of the Parties**

As to the functions, Core objects to the inclusion of reference numbers. Core notes the MPEP states that the use of reference characters in a claim is considered to have no effect on the scope of the claim. Dkt. No. 120 at 5. Core cites to three district court cases that have rejected the use of reference characters to limit claims. *Id.* at 5, n.28. Core asserts that the reference numbers will confuse the jury into believing the reference numbers are limiting.

Defendants assert that the functions of means-plus-function terms are the explicitly recited functions in the claims. Dkt. No. 140 at 3 (citing *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999) (Section 112(f) "does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claims)). Defendants assert the recited functions include the reference characters. Defendants assert that none of Core's citations relate to the use of reference characters in a means-plus-function term, and that, in any case, the MPEP is not binding on Courts. Dkt. No. 140 at 3, n.5.

As to the Term 1 and 2 structures, Core objects to Defendants' inclusion of the weighting filter 302. Core asserts that the weighting filter does not perform the claimed function. Core asserts that the weighting filter function is performed prior to power measurements ('823 Patent 4:52-55, claim 21). *Id*. Core also objects to Defendants' inclusion of the VAD in Term 2. Core asserts that the VAD is used to determine when to measure the noise level ('823 Patent 4:62-66).

As to Term 3, Core asserts its construction includes the sole structure that performs the claimed function of measuring the noise level in a space (the power measuring unit 313). Core argues that neither the weighting unit 312 nor VAD unit 311 actually performs this function. Core notes the specification states that a combination of structures might be used for "producing measurement result" ('823 Patent 5:10-14) but not for the measurement itself. Core asserts that the specification further references the "the measurement result from the power measuring unit 313." '823 Patent 6:1-3. Core asserts that Defendants acknowledge that the weighting filter (at issue in Terms 1-3) performs a weighting function separate from the "power measurement" function because Defendants' brief stated that the weighting function "is done prior to the power measurement." Dkt. No. 146 at 1, n.7 (quoting Dkt. No. 140 at 2).

As to Term 4, Core objects to Defendants' inclusion of delay unit 305. Core asserts that the adjusting unit 304 and the multiplier 306 are the only structures that perform the function of adjusting the level and/or dynamic range of a first audio signal. Dkt. No. 120 at 7 (citing '823 Patent 5:43-47). Core argues that the adjusting unit 304 chooses dynamic range and level adjusting parameters based on various near- and far-end measurements to determine a control value and that the multiplier 306 applies that control value to the signal. *Id*. (citing '823 Patent 5:15-19, 5:42-44, 5:20-24). Core asserts that the delay unit 305 only corrects the timing signal, it does not adjust it. Further, Core argues that the delay unit is optional, as the specification states

that adjustment of the signal "can be performed" using the delay unit. *Id*. at 8 (citing '823 Patent 5:20-24). Core contends that if the delay unit 305 was mandatory, it would have been included in the claim itself.

As to terms 1 and 2, Defendants assert that Figure 3 shows that the signal s1a is never fed directly into the power measuring unit 303 to perform the claimed function. Defendants assert that s1a is first fed into a weighting filter 302 to produce "frequency-weighted signal s1f" and that s1f is then fed into unit 302. Dkt. No. 140 at 1-2 (citing '823 Patent Figure 3, 4:50-62). Defendants thus conclude that the weighting filter is required structure as it produces s1f, which is the signal that is measured. Defendants also assert that the power measuring unit performs a specific type of measurement on s1f: a "running average calculation;" therefore, this description must also be included in the construction. *Id*. at 2.

As to Term 2, Defendants also assert that the voice activity detector (VAD) is integral to the measurement of p2, which can only take place when the VAD detects "silent moments, i.e. when the signal contains no speech." '823 Patent 4:63-64. Defendants assert the VAD is, thus, also required structure. Dkt. No. 140 at 2.

As to Term 3, Defendants assert that the measurement result p3 is obtained as follows: "corresponding noise level power measurement is performed for the signal s2a picked up at the near-end, using the weighting unit 312, power measuring unit 313 and VAD 311, thereby producing measurement result p3." '823 Patent 5:10-13.

Defendants assert that for each of Terms 1-3, the additional structure is required for performing the "measuring" functions as merely generic power measuring units are incapable of performing the functions alone. Dkt. No. 140 at 4. Defendants also assert that Core's

constructions would encompass any measuring circuits, beyond the specific measurement techniques disclosed. *Id.*

As to Term 4, Defendants contend that "adjusting the level and/or dynamic range" is accomplished by "multiplying, in a multiplier 306 the delayed signal s1b by value d1 determined by the adjusting unit." '823 Patent 5:22-24. Defendants assert the delayed signal s1b is produced by the delay unit 305. Dkt. No. 140 at 2. Defendants argue that Core's construction leaves out the required delay unit and claims any adjusting unit and multiplier. *Id.* at 4.

**Analysis**

Courts that have considered the implications of the use of reference numbers in a claim have followed the general rule that reference numbers do not limit the claims. *Relume Corp. v. Dialight Corp. et al.*, 63 F. Supp. 2d 788, 796, n. 6 (E.D. Mich. 1999) ("A reference numeral is simply a convenient tool for directing the reader to an example of the element the patentee has claimed. Had the drafter wanted to incorporate the limitations of the preferred embodiment into the language of claim 1, he or she could have done so quite easily with words."); *EasyCare, Inc. v. Lander Industry*, No. 4:08-cv-665, 2011 U.S. Dist. LEXIS 130241, *28 (D. Ariz., Nov. 8, 2011); *KEG Kanalreinigigungstechnick GmbH v. Laimer*, No. 1:11-cv-1948, 2013 U.S. Dist. LEXIS 188220, *74-78 (N.D. Ga., Jan. 11, 2013). The MPEP similarly states that reference numbers are "considered as having no effect on the scope of the claims:"

> Reference characters corresponding to elements recited in the detailed description and the drawings may be used in conjunction with the recitation of the same element or group of elements in the claims. The reference characters, however, should be enclosed within parentheses so as to avoid confusion with other numbers or characters which may appear in the claims. The use of reference characters is to be considered as having no effect on the scope of the claims.

MPEP §608.01(m) (9th ed., March 2014). Though Defendants are correct that none of the prior courts have specifically addressed reference numbers within means-plus-function terms, the

rationale for excluding such numbers is equally applicable to means-plus-function terms. The Court finds that the function does not include the reference numbers.[6]

As to Terms 1 and 2, the stated functions are merely measuring the level of the audio signal to obtain a first/second measured value. Defendants would have the functions of Terms 1 and 2 include weighting a signal and then measuring a weighted signal. The specification states that:

> Prior to power measurement, a frequency weighting with a weighting filter 302 is performed for the digital signal $s_{1a}$ received from the far-end to achieve even loudness perception at various frequencies.

'823 Patent 4:52-55. The claimed function for Term 1 is merely related to measuring the level of the first audio signal to obtain a measured value. The weighting filter is described as adjusting the signal to achieve even loudness perception at various frequencies. This is a different function. The additional weighting filter structure Defendants add is, thus, directed toward an additional unclaimed function. The corresponding structure is limited to only the structure that is linked to the recited function. *Omega Engineering, Inc. v. Rayteck Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003). Thus, the corresponding structure includes the power measuring unit 303 shown and described in the specification but does not include the weighting filter 302.

As to Term 2, the weighting filter discussion above is equally applicable. However, the dispute regarding the voice activity detector (VAD) is different. The function for claim 2 is "measuring the noise level in the first audio signal to obtain a second measured value." The technique to measure the noise level in the input signal is described in the patent as requiring more than just the power measuring unit 303. In particular, the '823 Patent describes a structure

---

[6] The Court notes that even if the reference numbers were included, the analysis of the corresponding structure would remain the same as the Court's conclusions are not based upon inclusion or exclusion of the reference numbers.

that enables the circuitry to detect when the speech signal level is silent, thus the remaining signal being the noise:

> The received signal level $p_1$ is measured continuously and the noise level $p_2$ is measured at silent moments, i.e. when the signal contains no speech. Detection of such silent moments is performed with a known voice activity detector (VAD) unit 301. The output signal $v_1$ of the VAD unit has two states depending on whether the input signal measured by the VAD unit is substantially speech or noise/interference. When the output signal $v_1$ of the VAD unit indicates to the adjusting unit 304 that the input signal is noise/interference, the adjusting unit stores the power value $p_2$ in memory and uses the value as the received signal noise level value in the adjustment of the dynamic range and level of the signal. Similarly, power value $p_1$ is used as the received signal level value in the adjustment of the dynamic range and level of the signal.

'823 Patent 4:62-5:9. As described, the structure for "measuring the noise level in the first audio signal to obtain a second measured value" requires knowledge of the silent moments, when the signal contains no speech. The corresponding structure for such function thus includes the voice activity detector (VAD) unit 301. The Term 2 corresponding structure includes the power measuring unit 303 and voice activity detector (VAD) unit 301 shown and described in the specification but does not include the weighting filter 302.

Term 3 is similar to Term 2 except the function relates to measuring the noise level in the space (the near-end). The analysis described above, with regard to Term 2, equally applies to Term 3. Thus, the corresponding structure includes the power measuring unit 313 and voice activity detector (VAD) unit 311 shown and described in the specification but does not include the weighting unit 312.

As to Term 4, Defendants seek to add a delay unit 305 to the corresponding structure. Once again, the claimed function provides guidance. In particular, it is noted that the claimed function is not merely adjusting the audio signal level. Rather, the adjustment is done "<u>in accordance</u> with said first, second, and third measured values." '823 Patent Claim 20 (emphasis

added). As described in the specification, to adjust the first audio signal "in accordance" with the measurement values, a time delay to account for the measurement circuitry that produces the measured values must be included:

> Correctly timed adjustment of the dynamic range and level of signal $s_{2a}$ can be performed by delaying signal $s_{2a}$ in a delay unit 305 and multiplying, in a multiplier 306, the delayed signal $s_{1b}$ by value $d_1$ determined by the adjusting unit. The multiplier 306 produces output signal $s_{1c}$ the dynamic range and level of which have been adjusted. The length of the delay generated by the delay unit 305 is advantageously set to equal the sum of the times that it takes to perform the weighting, power measurement and control value calculation. The delay unit 305 can be realized by means of a shift register, for example.

'823 Patent 5:20-30. Thus, to achieve the claimed function, the specification describes the use of the delay unit 305. The Term 4 corresponding structure includes the adjusting unit 304, delay unit 305, and multiplier 306 shown and described in the specification.

**The Court construes "means (303) for measuring the level of the first audio signal (s1a) to obtain a first measured value (p1)" as having a function: "measuring the level of the first audio signal to obtain a first measured value" and a structure: "power measuring unit 303 as shown in Fig. 3 and 4:60-62, and statutory equivalents thereof."**

**The Court construes "means (303) for measuring the noise level in the first audio signal (s1a) to obtain a second measured value (p2)" as having a function: "measuring the noise level in the first audio signal to obtain a second measured value" and a structure: "power measuring unit 303 as shown in Fig. 3 and 4:60-62 and voice activity detector (VAD) unit 301 as shown in Fig. 3 and 4:64-5:2, and statutory equivalents thereof."**

**The Court construes "means (313) for measuring the noise level in said space to obtain a third measured value (p3)" as having a function: "measuring the noise level in said space to obtain a third measured value" and a structure: "power measuring unit 313 as**

shown in Fig. 3 and 4:60-62, and voice activity detector (VAD) unit 311 as shown in Fig. 3 and 4:64-5:2, and statutory equivalents thereof."

The Court construes ""means (304, 306) for adjusting the level and/or dynamic range of the first audio signal (s1a) in accordance with said first, second, and third measured values (p1, p2, p3)" as having a function: "adjusting the level and/or dynamic range of the first audio signal in accordance with said first, second and third measured values" and a structure: "adjusting unit 304 as shown in Fig. 3 and 5:43-44, delay unit 305 as shown in Fig. 3 and 5:29-30, and multiplier 306 as shown in Fig. 3 and 5:22, and statutory equivalents thereof."

## 2. Claim 1 Preamble (Term 8)

"A method for adjusting the level and/or dynamic range of a first audio signal (s1a) containing noise and information for reproduction in a space containing acoustic noise, comprising the steps of:"

| Core Wireless's Construction | Defendants' Construction |
|---|---|
| The preamble is not limiting. | No construction necessary [beyond constructions of components], but preamble is limiting. |

The parties dispute whether the antecedent basis provided in the preamble renders the preamble a limitation.

**Position of the Parties**

Core asserts that the preamble only recites the purpose for the claimed method - to make adjustments to an audio signal for reproduction in a noisy space. Dkt. No. 120 at 10. Core argues that the preamble does not include any of the claimed steps, and the body of the claim provides a complete invention; the preamble is not "necessary to give life, meaning, and vitality" to the claim. *Id*. Core contends that merely because the preamble provides the antecedent basis for the

"first audio signal," this does not render the entire preamble a limitation. Core asserts that "first audio signal" is merely duplicative of the limitations in the body of the claim. Dkt. No. 146 at 2.

Defendants respond that the preamble is limiting because it recites "a first audio signal," and thus provides the antecedent basis for multiple limitations that refer to "said first audio signal." Dkt. No. 140 at 5 (citing *ChriMar Sys., Inc. v. Alcatel-Lucent, Inc.*, No. 6:13-cv-880-JDL, 2015 WL 233433, at *7 (E.D. Tex. Jan. 8, 2015) and *Mobile Telecomms. Techs., LLC v. Leap Wireless Int'l, Inc.*, No. 2:13-cv-885-JRF-RSP, 2015 WL 2250056, at *12-13 (E.D. Tex. May 13, 2015)).

**<u>Analysis</u>**

In general, a preamble limits the invention if it recites essential structure or steps, or if it is "necessary to give life, meaning, and vitality" to the claim. Conversely, a preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citations omitted). "When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention." *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003); *See also Proveris Scientific Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1373 (Fed. Cir. 2014) ("The phrase 'the image data' clearly derives antecedent basis from the 'image data' that is defined in greater detail in the preamble as being 'representative of at least one sequential set of images of a spray plume.'"). Thus, particularly when there is extensive use of the preamble to provide antecedent basis for terms used in the bodies of the claims, the preamble can "recite essential structure." *See Catalina Mktg.*, 289 F.3d at 808; *see C.W. Zumbiel Co. v. Kappos*, 702 F.3d 1371, 1385 (Fed. Cir. 2012)

("Here, 'containers' as recited in the claim body depend on 'a plurality of containers' in the preamble as an antecedent basis. Therefore, these terms recited in the preamble are limitations…").

Though Core argues that the preamble merely provides antecedent basis for "first audio signal," the preamble does more. For example, the preamble recites "adjusting the level and/or dynamic range of the first audio signal." In the body of the claim, "adjusting the level and/or dynamic range of said first audio signal" is recited. Further, the preamble describes the first audio signal as "containing noise and information for reproduction in a space." The body of the claim similarly states "noise level of said first audio signal." The preamble also references "a space" while the body of the claim includes "said space." Finally, it is noted that the preamble describes the space as "containing acoustic noise." The body of the claim includes "measuring the noise level of said space." Given all of these factors together, the preamble provides both "essential" elements and gives "life, meaning, and vitality" to the claim. Based on either prong of the analysis, the preamble of claim 1 is limiting.

**The Court finds that the preamble is limiting. The Court finds that the preamble has its plain and ordinary meaning and no further construction is necessary.**

**II.    '667 Patent**

**1.    "message" - Claims 12-15 (Term 12)**

| Core Wireless's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning / no construction necessary<br><br>In the alternative: data organized in a form that can be processed by the recipient | SMS text message |

The primary dispute is whether "message" is limited to an SMS message.

**Position of the Parties**

Core asserts that the claims do not use "SMS text" and that Defendants' use of that term is merely an incorporation of a preferred embodiment. Dkt. No. 120 at 14. Core contends that the specification provides a broader meaning of "message." Core asserts that the specification describes a GSM network "by way of example" ('667 Patent 2:67) but also mentions DAMPS and UMTS. Dkt. No. 120 at 14. Core asserts that merely because the GSM example was used, SMS messages were described in the specification. Core asserts that other messaging technologies were known at the time of the invention, including Wireless Application Protocol and MMS. Dkt. No. 120 at 14 (citing Bayen Decl.). Core argues that if a definition is needed, Core's alternative definition is supported by extrinsic evidence.

Defendants contend that the patent exclusively describes an SMS text message as the message used to communicate the request for location information from a mobile station and refers to SMS over fifty times. Dkt. No. 140 at 9 (citing '667 Patent Abstract, 1:54-63, 3:8-16, 4:8-14, 4:40-43, Figures 1, 3-7). Defendants assert that as the entire focus of the patent is to provide the information via SMS, a person of ordinary skill would understand that the use of "message" in the claim refers to "SMS text messages." *Id.* (citing *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1369 (Fed. Cir. 2014) (claim scope cannot be broader than the invention set forth in the specification)). Defendants assert that Core has failed to show that a message can be anything other than an SMS text message, and that the specification does not suggest SMS was chosen as a mere "example." Defendants assert that it makes no sense to conclude that SMS was used solely because the inventors used GSM given that the other disclosed networks (DAMPS and UMTS) also supported SMS. Dkt. No. 140 at 10 (citing Wells Decl.).

As to the Bayen declaration, Defendants argue that extrinsic evidence can only be used to resolve ambiguity in the intrinsic evidence, and there is no ambiguity here. Defendants further state that though Core argues other message protocols were available in the prior art, the specification neither suggests their existence nor explains how they could be used for the claimed invention. Dkt. No. 140 at 10-11.

Defendants argue that Core's alternative construction is not supported. Defendants assert that the specification makes a clear distinction between "data" and "message." Defendants assert that a message is used to send data. *Id.* at 11 (citing '667 Patent claim 1, 4:8-11, 4:40-45, 5:5-7, 5:19-24). Defendants assert that Core cherry picks support from an extrinsic evidence dictionary. Defendants assert that Core's overly generic definition of "message" could apply to almost anything, for instance even letters. *Id.*

In reply, Core asserts that reliance on *Gemalto* by Defendants is misplaced because the Defendants have not identified a single disclaimer of claim scope or distinctions / criticism of the prior art. Dkt. No. 146 at 4.

<u>**Analysis**</u>

Neither party contends that the term "message" would not be understood by those of ordinary skill in the art. Further, Defendants' own construction even uses the term "message." Defendants' sole position is that the specification only refers to SMS messages. As the Federal Circuit has noted:

> However, the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms. For instance, although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.

*Phillips*, 415 F.3d at 1323. A disavowal of claim scope must be clear. *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011) ("[E]ven where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words of expressions of manifest exclusion or restriction" (citation omitted)). Here, Defendants have not identified disavowal in the intrinsic record. Defendants also have not established that the patentee acted as his own lexicographer. Further, it is noted that some claims specifically reference an SMS message (claim 11) while the claims at issue do not. Similarly, the specification contains passages in which "message" is not limited to SMS. '667 Patent 2:17-32.

Core's alternative definition ignores the plain meaning of "message," which neither party contends would not be known. Core expands the term to include any data. Such a construction does not conform to the understanding of the plain meaning to one in the art.

**The Court finds that "message" has its plain and ordinary meaning and no further construction is required.**

## 2. "provision of the location finding information" - Claim 13 (Term 13)

| Core Wireless's Construction | Defendants' Construction |
|---|---|
| location finding information being provided to the user | Indefinite |

The parties dispute whether the claim is drafted to have mixed apparatus and method limitations, and is thus invalid under *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005).

**Positions of the Parties**

Core asserts that its construction is supported by the specification:

The resulting data is displayed by MS1 to the user thus providing information about the location of MS2 to the user of MS1.

'667 Patent 4:43-45. Core further asserts that the specification teaches that the message "containing the retrieved data from the location messaging server" can then be displayed by the mobile station. '667 Patent 4:8-14.

Core argues that the claim term is not written as a method step. The elements recite "circuitry operable" to send a request, "circuitry operable" to "receive a message," and "wherein provision of the location finding information" is made. Core asserts that none of these elements are written in method claim format. Core also asserts that the use of functional language in an apparatus claim does not render a term indefinite. Dkt. No. 120 at 16. Core distinguishes the *IPXL* case, arguing that here, the claim is not drafted in a manner that would make it unclear when infringement has occurred. Core asserts it is clear that the claim is infringed by an apparatus that contain structures that are "operable" to send a request and receive a message. *Id*.

Defendants note that the claim is directed to an apparatus, "a mobile station." Defendants assert that Term 13 is a method step and that the inclusion of this step results in a combination of statutory classes of invention, rendering the term indefinite. Dkt. No. 140 at 12-13 (citing *IPXL Holdings,* 430 F.3d at 1384). Defendants assert that Core's construction refutes Core's arguments that a user need not perform any steps, as the "provisioning" of location information would only occur after the user makes the "request." Dkt. No. 140 at 13, n.12. Defendants further state that the "displaying" referenced by Core's cited passages is referenced in claim 14. *Id*. at 13.

**Analysis**

The holding in *IPXL* was based on the concern that notice should be given to the public as to whether infringement occurs when one creates a system, or when the user actually uses the system. *IPXL Holdings L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005). Thus, mixed claiming has been found to be improper where it would create such confusion. *IPXL*, 430 F.3d at 1379, 1384 (the claim language included "and the user uses the input means to either change…"); *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1318 (Fed. Cir. 2011) (the claim language included "said certain of said individual callers digitally enter data"); *H-W Tech., L.C. v. Overstock.com, Inc.*, 758 F.3d 1329, 1336 (Fed. Cir. 2014) (the claim language included "wherein said user completes" and "where said user selects").

The claim language at issue in claim 13 does not create such confusion. Mere use of function language does not render a claim invalid. *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) (stating that the claim "is clearly limited to a pipelined processor possessing the recited structure and capable of performing the recited functions"); *SFA Sys., LLC v. 1-800-Flowers.com, Inc.,* 940 F. Supp. 2d 433, 454-55 (E.D. Tex. 2013) ("If the functional language of the claim merely describes 'the structure and capabilities of the claimed apparatus, then the claim is sufficiently definite under 35 U.S.C. § 112 ¶ 2;" and upholding claims as definite where "[t]he functional language merely describes the functional capability of the claim structures. Therefore, there is no uncertainty about when infringement would occur—it plainly occurs when a system is created that can perform the claimed functions") (internal citations omitted); *Eolas Techs., Inc. v. Adobe Sys., Inc*., 810 F. Supp. 2d 795, 812-14 (E.D. Tex. 2011) ("functional apparatus language is not indefinite when it describes the capabilities of the apparatus.").

Here, the claim is clearly directed to a mobile station "for receiving location finding information,"[7] and the claim elements are drafted as "circuitry operable to send a request for location finding information" and "circuitry operable to receive." In such context, the subsequent wherein clause "wherein provision of the location finding information being made without pre-registering the mobile station…" merely describes the functionality of the system related to the mobile station not being required to pre-register. Thus, the mobile station has the capability of being provided the location information without pre-registering. It is clear that the claim is directed to the mobile station apparatus and not to a method of use.

Having resolved the dispute as to mixed claiming, the Court finds the term needs no further construction as the plain meaning is clear from the context of the claim.

**The Court finds that "provision of the location finding information" has its plain and ordinary meaning and no further construction is required.**

3. **"location finding information based on the cell occupied by at least one mobile station" - Claims 12 & 13 (Term 14)**

| Core Wireless's Construction | Defendants' Construction |
|---|---|
| location finding information determined using cell information (e.g., cell identity) that corresponds to a geographical area where at least one mobile station is located | location finding information based on the geographical area within the usable range of the cellular base station that includes at least one mobile station |

The parties dispute whether "usable range" is necessary to understand the term and whether a "cell identity" provides a basis for location information.

<u>Positions of the Parties</u>

Core asserts that its construction makes clear how the overarching system determines finding information "based on the cell occupied." Core assets that Defendants' proposal adds

_____
[7] As noted with regard to Term 15, the preamble has been construed to be a limitation of the claim.

ambiguity. Core notes the specification explains that, in the GSM standard, "each cell has an individual identity known to the network" ('667 Patent 3:24-25) and further states that "when the handset MS1 communicates with BTS1, the cell identity corresponds to a rough geographical location for the handset" ('667 Patent 3:26-28). Core asserts that Figure 2 demonstrates this relationship. Core thus asserts that cell ID provides the link between a mobile station and a determination of its location. Core argues that Defendants' use of "within the usable range" is confusing because it provides no context for what this phrase means (i.e., a juror is unlikely to know what the usable range of a cellular base station is). Core asserts that Defendants' construction fails to account for the one-to-one correlation between a cell identity and a particular geographical area. Core also asserts that Defendants' construction also fails to account for the fact that a determination of location based cell information must be made. Dkt. No. 120 at 17.

Defendants respond that their construction uses the definition of "cell" and substitutes it into the specification. Defendants assert that Core rewrites the claims to require something not claimed: "cell information (e.g., cell identity)." Dkt. No. 140 at 11. Defendants cite to the specification: "each cell of the network corresponds to a particular geographical area." '667 Patent 1:15-16. Defendants assert that the specification describes Figure 2 as showing "an individual cell associated with a base station controller" and that the base station "has a usable range." Dkt. No. 140 at 11 (quoting '667 Patent 3:17-19). Defendants assert that "usable range" of a cell phone would be understood by a jury. Defendants also assert the claims further reinforce that a "cell" is a physical geographic area by referencing a "cell" being occupied by a mobile station. *Id.* Defendants argue that Core attempts to rewrite the claim to have location finding information being based on the cell ID rather than, as claimed, the cell itself. *Id.*

At the oral hearing, both parties agreed that "cell," as used in the term, refers to a geographic area. With that agreement, Defendants agreed to a construction of "plain and ordinary meaning." Dkt. No. 218 at 42-44.

## Analysis

The claim term, as drafted, would be understandable to both one skilled in the art and to a jury. Defendants' construction adds ambiguity and unnecessary complication with reference to the "usable" region of a geographic area. Defendants also add a term that is not included within the claim: "cellular base station." Core is correct that the specification states that "when the handset MS1 communicates with BTS1, the cell identity corresponds to a rough geographical location for the handset." '667 Patent 3:26-28. Thus, the specification clearly links a cell identity to establishing a rough location of a handset and indicates that the specification location finding information based on a cell may be established by a cell identity. However, the claim is not only limited to that example but rather more broadly states "location finding information based on the cell." As agreed by both Core and Defendants, "cell" references a geographic area. The plain language of the claim provides a more complete boundary for what is claimed, and as mentioned above, would be understandable to both one skilled in that art and a lay jury. As the parties have agreed that "cell" references a geographic area, the disputes have been resolved such that the plain and ordinary meaning applies.

**The Court finds that "location finding information based on the cell occupied by at least one mobile station" has its plain and ordinary meaning and no further construction is required.**

4.     **Claims 12 and 13 Preambles (Term 15)**

**"A method of operating a mobile station to receive location information from a location finding service in a cellular communications network" - Claim 12**

**"A mobile station for receiving location finding information from a location finding service in a cellular telecommunications network" - Claim 13**

| Core Wireless's Construction | Defendants' Construction |
|---|---|
| The preamble is not limiting. | No construction necessary [beyond constructions of components], but preamble is limiting. |

The parties dispute whether the antecedent basis provided in the preambles renders the preambles a limitation.

**Position of the Parties**

Core asserts that neither preamble recites any steps or any language that breathes life into the invention. Core contends that the preambles merely state only the purpose of each claim, and that in such circumstances, a preamble is non-limiting. Dkt. No. 120 at 18. Core asserts that the Federal Circuit decision in *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) is particularly instructive. Core asserts that the claim is merely a method claim in which the preamble recites the use of structure (*Catalina* having an apparatus claim with a preamble merely describing a use or purpose of the structure). Further, Core asserts that the distinguishing feature for the claim is not found in the preamble. Finally, Core asserts that deleting the preambles would have no significant effect on the claims, as the bodies of the claims each define complete inventions. *Id.* at 18-19.

Defendants assert that the preambles provide antecedent for both "a location finding service" and "a cellular telecommunications network." Dkt. No. 140 at 8 (noting that antecedent basis can make a preamble limiting, citing *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1376 (Fed. Cir. 2005)). Defendants note that even the *Catalina* case stated "dependence on a particular disputed preamble phrase for antecedent basis may limit claim scope because it

indicates a reliance on both the preamble and the claim body." *Catalina Mktg. Int'l, Inc.*, 289 F.3d at 808.

In reply, Core asserts that merely because a term finds antecedent basis in the preamble does not alone establish that the preamble gives meaning to the claims. Core cites to *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co., Ltd.*, No. 4:14-cv-371, 2015 U.S. Dist. LEXIS 77346 at *52-54 (E.D. Tex. June 16, 2015) for the proposition that the use of "the" did nothing to give meaning to the recited body terms. Core asserts that Defendants have not shown that, here, the use of "the" provides meaning or context to the claims. Dkt. No. 146 at 6 (asserting that *Seachange* requires the Court to consider if the preamble provides context to understand the claim meaning).

**Analysis**

In general, a preamble limits the invention if it recites essential structure or steps, or if it is "necessary to give life, meaning, and vitality" to the claim. Conversely, a preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Catalina Mktg. Int'l, Inc.*, 289 F.3d at 808 (citations omitted). "When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention." *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003); *See also Proveris Scientific Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1373 (Fed. Cir. 2014) ("The phrase 'the image data' clearly derives antecedent basis from the 'image data' that is defined in greater detail in the preamble as being 'representative of at least one sequential set of images of a spray plume.'"). Thus, particularly when there is extensive use of the preamble to provide antecedent basis for terms used in the bodies of the claims, the preamble "recites

essential structure." *See Catalina Mktg.*, 289 F.3d at 808; *see C.W. Zumbiel Co. v. Kappos*, 702 F.3d 1371, 1385 (Fed. Cir. 2012) ("Here, 'containers' as recited in the claim body depend on 'a plurality of containers' in the preamble as an antecedent basis. Therefore, these terms recited in the preamble are limitations . . . .").

The preambles not only provide antecedent basis for the terms "a location finding service" and "a cellular telecommunications network," the preambles link those terms as the service is "in" the cellular network. The particular "location finding service" that is found in the claim body is further described in the preamble as the service from which the mobile station receives location information: "a mobile station to receive location information from a location finding service." Thus, similar to as described above with reference to the '823 claim 1 preamble, when considering the totality of the preamble and the claim, the preambles here provide both "essential" elements and give "necessary to give life, meaning, and vitality" to the claim. Based on either prong of the analysis, the preambles of claim 12 and 13 are limiting.

**The Court finds that the preambles of claims 12 and 13 are limiting. The Court finds that the preambles have their plain and ordinary meaning and no further construction is necessary.**

### 5. Circuit Operable Terms (Terms 18-19)

**"circuitry operable to send a request for location finding information from a mobile station as a message through the network to a location message server" - Claim 13 (Term 18)**

| Core Wireless's Construction | Defendants' Construction |
| --- | --- |

| Core Wireless's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning / no construction necessary.<br><br>This element is not governed by 35 U.S.C. § 112(6).<br><br>To the extent the Court finds this element to be governed by 35 U.S.C. § 112(6), Core Wireless proposes the following:<br><br>**Alternative Function:** sending a request for location finding information from a mobile station as a message through the network to a location message server<br><br>**Alternative Structure:** mobile station (MS) | This element is governed by 35 U.S.C. § 112 ¶ 6.<br><br>**Function**: send a request for location finding information from a mobile station as a message through the network to a location message server<br><br>**Structure**: Indefinite |

**"circuitry operable to receive from the location message server, a message containing location finding information based on the cell occupied by at least one mobile station" - Claim 13 (Term 19)**

| Core Wireless's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning / no construction necessary.<br><br>This element is not governed by 35 U.S.C. § 112(6).<br><br>To the extent the Court finds this element to be governed by 35 U.S.C. § 112(6), Core Wireless proposes the following:<br><br>**Alternative Function:** receiving from the location message server, a message containing location finding information based on the cell occupied by at least one mobile station<br><br>**Alternative Structure:** mobile station (MS) | This element is governed by 35 U.S.C. § 112 ¶ 6.<br><br>**Function**: receive from the location message server, a message containing location finding information<br><br>**Structure:** Indefinite |

The parties dispute whether these are means-plus-function terms because the word "means" is not used. If construed as a means-plus-function term, the parties also dispute whether a corresponding structure is disclosed in the specification.

**Positions of the Parties**

Core asserts that under *Williamson*, a presumption exists that the terms are not means-plus-function terms when the word "means" is not used. Core notes that *Williamson* found that the presumption was not "strong," but still a presumption exists. Dkt. No. 120 at 20. Core also asserts that the Federal Circuit has found that "when the structure-connoting term 'circuit' is coupled with a description of the circuit's operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112 ¶ 6 presumptively will not apply." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004). Core asserts that the claims specifically recite the operations of sending requests, receiving LBS-related messages and re-sending LBS-related messages. Additionally, Core asserts that the term "circuitry" by itself connotes structure. Dkt. No. 120 at 20 (citing *Mass Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1355 (Fed. Cir. 2006)). Core also asserts that the wireless communications circuitry in a mobile station has a well understood structural meaning to those in the art. *Id.*

If the Court finds the term a means-plus-function term, Core asserts that the parties are near agreement on the functions. Core asserts that the corresponding structure is amply supported by the intrinsic evidence to be a mobile station. Core asserts that one skilled in the art would recognize this. Core asserts that the claims are drawn to a "mobile station" and that the specification repeatedly refers to MS1 and MS2 as the mobile stations performing the claimed functions. '667 Patent Figures 3-6, 3:36-5:23. Core asserts that Defendants admit the circuitry must be "in a mobile station." Dkt. No. 146 at 7 (citing Dkt. No. 140 at 14-15). Core argues that no person of skill in the art would confuse a mobile station with a general purpose computer. *Id.*

Defendants note that under *Williamson*, the question is whether the term is understood by those in the art to have a sufficiently definite meaning as the name of structure. Dkt. No. 140 at 13-14 (citing *Williamson*, __F.3d__, 2015 WL 3687459, at *6 (Fed. Cir. June 16, 2015)). Defendants note that *Williamson* found "module" to be a nonce word equivalent to "means" that merely is a "black box" recitation of structure. *Id*. at 14. Defendants assert that "circuitry operable to send" and "circuitry operable to receive" is equivalent to "means to send" and "means to receive." *Id*. Defendants assert that the proper standard is not whether any structure is disclosed but whether structure sufficient to perform the claimed function is disclosed. Dkt. No. 140 at 14. Defendants assert that in *Linear Tech*, the "circuitry" referred to an electronic circuit with specific properties. *Id*. (citing *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004)).

As to the corresponding structure in the specification, Defendants contend that Core improperly argues that the mobile station is the structure of all three claimed functions. Defendants assert that the structure of one function cannot fill the gaps in the specification as to another function as in such case the functional claiming would be unbounded by any reference to the specification. *Id*. at 15 (citing *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1319 (Fed. Cir. 2012)). Defendants further assert that the structure for a general purpose processor must include an algorithm. *Id*.

**<u>Analysis</u>**

There is a presumption that 35 U.S.C. § 112, ¶ 6 does not apply because "means" is not used. *See Williamson,* 2015 WL 3687459, at *6-7 (holding that a presumption exists if the word "means" is not used). "The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id*.;

*See Apple, Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) ("The correct inquiry, when 'means' is absent from a limitation, is whether the limitation, read in light of the remaining claim language, specification, prosecution history, and relevant extrinsic evidence, has sufficiently definite structure to a person of ordinary skill in the art.").

Though Defendants provide attorney argument that "circuitry" is a nonce word, Defendants have not pointed to persuasive evidence that the term "circuitry" does not connote structure to one skilled in the art. The Federal Circuit has repeatedly held that "circuitry" connotes structure to those in the electronic arts in the context of § 112 ¶ 6 analysis. *Linear Tech. Corp.*, 379 F.3d at 1320; *Mass Inst. of Tech*, 462 F.3d at 1355; *Apex Incl. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1373 (Fed. Cir. 2003). Defendants have not established that "circuitry" does not connote structure. Though Defendants attempt to distinguish *Linear Tech.* based on the extent of the circuit descriptions in the stated function, *Linear Tech.* first noted that the general term connotes structure. *Linear Tech. Corp.*, 379 F.3d at 1320. Further, the "circuitry operable" claim elements do provide further structure: operable to send information from a mobile station as a message through the network and operable to receive the message from a server. Further, it is noted that the Defendants' arguments do not distinguish the claim limitation of *Mass Inst. of Tech.* "aesthetic correction circuitry for interactively introducing aesthetically desired alterations into said appearance signals to produce modified appearance signals." *Mass Inst. of Tech*, 462 F.3d at 1355.[8] At the oral hearing, the Court asked Defendants to identify any case that has found "circuitry" to not be structure. Defendants identified *HTC Corp. v. IPCom GmbH & Co.*, 667

---

[8] *Mass Inst. of Tech* issued after *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354 (Fed. Cir. 2004). *Williamson* overturned *Lighting World* (which had changed the presumption to a "strong" presumption) and *Williamson* restored the pre-*Lighting World* presumption. *Williamson*, 2015 WL 3687459, at *6-7 ("Henceforth, we will apply the presumption as we have done prior to *Lighting World*"). Though post-*Lighting World*, *Mass Inst. of Tech* applied the pre-*Lighting World* standards and did not characterize the presumption as "strong." *Mass Inst. of Tech.* 462 F.3d at 1353.

F.3d 1270 (Fed. Cir. 2012). Dkt. No. 218 at 52. *HTC* is not on point. HTC did not deal with the term "circuitry" but rather the term was:

> "mobile station comprising ... an arrangement for reactivating the link with the first base station if the handover is unsuccessful." The parties agree that the term "arrangement for reactivating" is a means-plus-function limitation.

*HTC Corp.*, 667 F.3d at 1278. That "an arrangement for reactivating" in a mobile station in *HTC* was agreed to be a means-plus-function limitation does not persuade this Court to ignore the repeated holdings that "circuitry" is structure.

**The Court finds that the terms "circuitry operable to send a request for location finding information from a mobile station as a message through the network to a location message server" and "circuitry operable to receive from the location message server, a message containing location finding information based on the cell occupied by at least one mobile station" have their plain and ordinary meaning and no further construction is necessary.**

## III. '020 Patent / '476 Patent

### 1. Additionally Being Configured Terms (Terms 21 and 22)

**"additionally being configured to display on the screen an application summary window that can be reached directly from the main menu" - '020 Claims 1, 16 (Term 21)**

**"additionally being configured to display on the screen an application summary that can be reached directly from the menu" - '476 Claims 1, 20 (Term 22)**

| Core Wireless's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning / no construction necessary | additionally being configured to display an application sub-menu together with the [main] menu by designating an application in the [main] menu |

The parties dispute whether a sub-menu must be displayed together with the menu.

**Positions of the Parties**

Core asserts that everything in the disputed terms is understandable to a juror. Core argues that Defendants' proposals do not define or explain the terms, rather add limitations. Core objects to Defendants' replacement of the claim language with the term "sub-menu." Core notes that "sub-menu" is not used anywhere in the specifications. Dkt. No. 120 at 23. Core further asserts that nothing in the specification supports the concept of requiring a sub-menu and main menu to be displayed "together" as proposed by Defendants. Core notes that even if Defendants point to Figure 2, Figure 2 is merely an example and that Figure 3 displays a single menu as a "longer App Snapshot," not two menus. *Id*. '020 Patent 3:31-39. Core also asserts that Defendants' use of "designating an application in the main menu" changes the entire scope of the claim. Core asserts that Defendants change the claim focus concerning "from where" to "how." *Id*.

Defendants argue their construction indicates that an application summary window appears when a user selects an application from the main menu (1) without the display of any intervening screens and (2) without the need for further user action. Dkt. No. 140 at 17. Defendants assert that the application summary window should appear with the main menu, and that Core's construction allows the application summary window to appear at any time, for any reason, and involve any number of additional screens or user steps. *Id*. Defendants assert that the plain language of the claim requires the summary window to be "reached directly from the main menu."

Defendants contend their constructions are consistent with the plain meaning of other claim language which consistently states that the user's selection from a main menu is what

causes the application window to appear ('020 Patent claim 3 "selecting one of said names or icons [from the main menu] causes the summary window for that application to be opened" and similar selecting elements in '020 Patent claim 2, and '476 Patent claims 2, 13, and 21).

Defendants argue that Core identifies no claim language that expressly or implicitly allows the application window to appear for any reason. Dkt. No. 140 at 18. Defendants assert that Core's construction could encompass summary windows that appear automatically without a user selecting the application from the main menu or that appear through the use of multiple screens. *Id*. Defendants say that such examples conflict with the claim language "reached directly from the main menu." Defendants further assert that their construction conforms to the specification including a problem in the prior art as to how a user navigates quickly and the patent's solution to that problem by reducing the number of steps. Dkt. No. 140 at 19.

Defendants argue their construction makes clear that the application summary window appears together with the main menu. Defendants point to repeated instances of the '020 Patent including both the application summary window and the main menu together. *Id.* Defendants also assert that the specification repeatedly describes the summary window as a drop-down box. *Id*. at 20. Defendants contend that the specification's repeated descriptions of the structure in this manner establishes that Core cannot seek constructions that are not so limited. *Id*.

Defendants further assert that the prosecution history supports their construction. Defendants point to the prosecution statements in which Defendants allege the Applicants distinguished prior art on the grounds that an application summary window must be displayed on the same screen as the main menu when the user selects an application from the main menu:

> [T]he present invention displays in a main menu a list of accessible applications, and by selecting (e.g., hovering the cursor over) one of the applications listed in the main menu, a summary window is opened showing various functions that can be selected within the selected application.

Dkt. No. 140 Ex. 6 at 2.

> [Richard prior art patent] contains no teaching whatsoever of a main menu listing
> available applications, and selection of one of the listed applications generating a
> list of selectable functions within that application.";

*Id*. at 3-4.

> [T]he present invention displays in a main menu a list of accessible applications,
> and by designating (e.g., hovering the cursor over) one of the applications listed in
> the main menu, a summary window is opened showing various functions that can
> be selected within the designated application….

Dkt. No. 140 Ex. 8 at 7-8.

Defendants assert that the Applicants also confirmed that the word "directly" refers to

displaying the summary window when the user selects an application from the main menu:

> The underlying purpose of the application summary window of the present
> invention is to provide the user with a shortcut to functions within an application
> directly from the main menu (i.e., when the application is designated).

Dkt. No. 140 Ex. 7 at 10.

As to Core's arguments, Defendants assert that "reached directly" does not have an

understood meaning and needs construction. Dkt. No. 140 at 22. Defendants assert that Core fails

to explain what the plain and ordinary meaning is and how it differs from Defendants'

constructions. *Id.*

Core replies that Defendants agree that "direct" carries a basic meaning that would be

understood to one in the art and the jury. Dkt. No. 146 at 7 (citing Dkt. No. 140 at 17-23). Core

asserts that the Defendants have not pointed to any language that clearly and unequivocally

redefines "directly." *Id*. Core asserts that Defendants misinterpret the specification. Core notes

that Defendants cite to a portion of the specification that indicates that common functions and

data can be brought "together, in one summary window." *Id*. at 8. Core asserts that there is

nothing in the specification to support Defendants' contention that the summary window must always be "brought together" with the main menu. *Id.*

Core argues that Defendants' reading of the prosecution history is incorrect because Defendants ignore the first half of the cited paragraph, which explains that it only describes "one implementation." *Id.* (citing Dkt. No. 140 Ex. 6). Core further asserts that none of the prosecution history states anything about an application summary window being "displayed on the same screen as the main menu."

At the oral hearing, Defendants raised, for the first time, arguments about the Allard prior art reference and a Patent Board appeal decision regarding Allard. Dkt. No. 218 at 57, 63. In particular, Defendants claimed that the Applicant emphasized a "summary window displayed on the main screen." *Id.* at 58-59. Defendants also noted that the Patent Board stated that "we agree with the Appellant's argument, which is consistent with the Examiner's initial position, that Allard does not teach the claimed application window being displayed while the application is in an unlaunched state." Decision on Appeal, Patent Trial and Appeal Board, Appeal 2010-008003, October 24, 2012 at 3.

## Analysis

Defendants acknowledge multiple times that the plain meaning of the term is clear. Dkt. No. 140 at 17-18. For example, with respect to "directly," Defendants assert that their construction conforms to the plain meaning. However, Defendants then deviate from the plain meaning by incorporating requirements that the user designates an application from the main menu. Such requirements are not part of the plain meaning of the claim term as drafted. Other claims explicitly include "selecting" from the main menu. The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at

1314. First, a term's context in the asserted claim can be very instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. Here, the different claim language highlights that the plain meaning of claim Terms 21 and 22 (which explicitly do not include the selecting language) is different from the other claims which explicitly include the recited selecting operation.

As to why an application window appears (Defendants' argument that an automatically appearing window would be encompassed), Defendants' arguments turn the purpose of claim construction on its head. The issue before the Court is to determine the meaning of the drafted claim language, not how the claims could have been limited. "The claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d at 1312. The plain language of the claim does not limit the claim as sought by Defendants. Defendants make much of the language that the window can be "reached directly from the main menu." That language, on its face, is clear and Core has not asserted a construction that would encompass indirectly reaching the window.

As to Defendants' argument that the claim does not address the solution to the problem presented in the patent, the Court disagrees. The claim term in question specifically recites that the "summary window that can be reached directly from the main menu." Again, more specific details as to the selecting are addressed in other claims but absent from Terms 21 and 22.

Defendants would have all the details of the preferred embodiment incorporated into every claim, even claims that explicitly do not include such details. Defendants even go so far as to require the combination of the summary window and the main menu. The explicit and clear

claim language does not include such limitations. Such importation of limitations is improper without disclaimer or clear redefinition. A disavowal of claim scope must be clear. *See Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011) ("[E]ven where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words of expressions of manifest exclusion or restriction" (citation omitted)). Moreover, it is noted that Figure 3 discloses an alternative embodiment from Figure 2. In Figure 2, a screenshot is shown in which the summary window consumes just a portion of the main menu space of the user's screen. '020 Patent Figure 2, 3:23-35. Figure 3, however, shows "a slightly longer App Snapshot." *Id*. at 3:35-36. As shown in Figure 3, the summary window consumes the user's entire screen except for the signal strength bars and battery status indicator. *Id*. at Figure 3, 3:35-44. The parties dispute whether or not the signal strength bars and battery indicator portion of Figure 3 is or is not part of the "main menu" and arguments could be made for each position.[9] That such ambiguity exists, though, counsels against a conclusion that the specification provides clear "expressions of manifest exclusion or restriction." *See Arlington Indus., Inc.* 632 F.3d at 1254. The Court concludes that the specification does not limit the claim term to the embodiment of Figure 2 in which a sub-menu is displayed together with the main menu.

Defendants also cite to the prosecution history. Prosecution history disclaimer must be clear. *See Omega Eng. v. Raytek Corp.*, 334 F.3d 1314, 1324-25 (Fed. Cir. 2003) ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on *definitive* statements made during prosecution. … We have, however, declined to apply the doctrine of prosecution history

---

[9] Defendants have not, however, identified any portion of what remains in Figure 3 that can provide a menu selection from the main menu. Defendants' argument that the menu remains is, thus, weakened.

disclaimer where the alleged disavowal of claim scope is ambiguous. … But where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender."). Here the prosecution history does not provide the disavowal Defendants' seek.

First, Defendants cite to an introductory passage in an October 22, 2007 Reply. It is clear that such passage references a mere embodiment as it begins: "In one implementation of the present invention…." Dkt. No. 140-6 Ex. 6 at 2. Defendants further cite to another passage in the argument section of that Reply regarding the Richard reference. The immediately preceding paragraph describes how the <u>Examiner</u> interpreted Richard as being able to display on the screen a main menu listing one or more applications. *Id*. at 3. The passage cited by Defendants then followed and was merely a statement countering the Examiner's characterization of Richard, rather than stating that the claims were limited to a displaying a sub-menu together with the main menu. When viewed in context, this Reply does not make a clear disavowal of claim scope.

Defendants also cite to a passage in a Reply dated September 23, 2008. This passage is an introductory passage similar to the introductory passage of the October 22, 2007 reply that clarifies "in one implementation of the present invention." Dkt. No. 140-8 Ex. 8 at 7-8.  Finally, the last prosecution statement cited by Defendants (Dkt. No. 140 Ex. 7 at 10), does not stand for the proposition that an application summary window must be displayed on the same screen as the main menu. When viewed in context, the prosecution history does not make a clear disclaimer as sought by Defendants.[10]

---

[10] Defendants also point to the appeal briefing and Board appeal decision regarding the Allard reference, an argument not raised in Defendants' briefing but raised at the oral hearing. It is clear from both the Applicant's statements and the Board's decision that the issue presented there related to the importance of displaying a window while the application was in an unlaunched state. It was the unlaunched state that was emphasized. The Applicant's arguments and Board decision do not support limiting the term to displaying "an application sub-menu together with the main menu."

The Court finds that the terms "additionally being configured to display on the screen an application summary window that can be reached directly from the main menu" and "additionally being configured to display on the screen an application summary that can be reached directly from the menu" have their plain and ordinary meaning and no further construction necessary.

## IV.    '671 Patent

### 1.    "idle screen" - Claims 1, 3, 5, 11, 12, 15, 16 (Term 23)

| Core Wireless's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning / no construction necessary.<br><br>To the extent the Court finds a construction is necessary, Core Wireless proposes the following:<br><br>"The screen which is displayed on a mobile telephone device when the user is not navigating to a particular function, nor actively using a particular application, such as a contacts application, or a messaging application. Personal computers have no equivalent to an idle screen." | Default screen displayed when the mobile telephone is switched on and therefore capable of receiving a voice call and the user is not navigating to a particular function, nor actively using a particular application. |

The parties dispute the implications of the passage at '617 Patent 1:28-35 which begins "[t]he term 'idle screen' refers to...."

**Positions of the Parties**

Core asserts that these two words are easily understood by a jury. Core asserts that to the extent construction is needed, the specification should be used:

> The term `idle screen` refers to the default screen displayed when the mobile telephone device is switched on and therefore capable of receiving a voice call. The idle screen is the screen which is displayed when the user is not navigating to a particular function, nor actively using a particular application, such as a contacts

> application, or a messaging application. Personal computers have no equivalent to
> an idle screen.

'671 Patent 1:28-35. Core asserts that Defendants' construction is a mishmash of only parts of this passage, while Core's construction is true to the specification words. Dkt. No. 125 at 25. Core asserts that the first sentence only states that the term "idle screen" refers to what is explained in the rest of the passage. Core argue it is the second sentence that says what an "idle screen" is: "The idle screen is….." Core contends this is the relevant sentence that defines the term. Core asserts that the third sentence reinforces this by saying what an idle screen is not. *Id.* Core asserts that Defendants' construction grafts a portion of the first sentence to only portion of the second sentence and ignores the third sentence.

Core asserts that the varying ways that the passage cited by parties can be read and combined indicates that the passage is not a clear statement of lexicography, and thus, the plain and ordinary meaning should apply. Dkt. No. 146 at 8. Core cites to the *Abbott Labs* case as an example where the Federal Circuit found that because the patentee provided "two alternative definitions of the term" there was not sufficient clarity and deliberateness to construe the term beyond its ordinary meaning. Dkt. No 146 at 9 (quoting *Abbott Labs. V. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1354 (Fed. Cir. 2003)). Core asserts that the '671 Patent provided multiple different meanings of the term. Core asserts that the first sentence focuses on the physical state of the device, and the second sentence concerns the user. *Id.*

Defendants assert that the patentee acted as their own lexicographer and set forth a definition in the '671 Patent 1:28-35 passage quoted above. Defendants assert that an act of lexicography controls. Dkt. No. 140 at 24 (quoting *Phillips*, 415 F.3d 1316 ("our cases recognize that the specification may reveal a special definition given to a term by the patentee that differs

from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs."")).

Defendants argue that Core's alternative construction ignores the first sentence of the definition provided in '671 Patent 1:28-35. Defendants assert that Core's statement that the first sentence merely refers to the second sentence ignores that the first sentence is part of the definition of the term: "an idle screen is… ." Dkt. No. 140 at 24. Defendants also note that numerous courts have found that use of the phrase "refers to" establishes lexicography. *Id.* (citing Federal Circuit cases).

Defendants contend that Core's construction imports two phrases that do not define "idle screen" but rather merely lists examples or states what an idle screen is not: (1) "such as contacts application or a messaging application" and (2) "personal computers have no equivalent idle screen."

## **Analysis**

"When a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009) (citing *Phillips*, 415 F.3d at 1321). Here, the passage at '671 Patent 1:28-35 acts as a clear statement of lexicography: "The term `idle screen` refers to …." Though Core asserts that the first sentence is not part of the definition, it is clear from the passage that both the first and second sentences are the sentences that define what an "idle screen" is:

> The term `idle screen` refers to the default screen displayed when the mobile telephone device is switched on and therefore capable of receiving a voice call. The idle screen is the screen which is displayed when the user is not navigating to a particular function, nor actively using a particular application, such as a contacts application, or a messaging application. Personal computers have no equivalent to an idle screen.

'617 Patent 1:28-35. The first and second sentences together provide context and understanding to the term. The examples listed at the end of the second sentence reinforce this context. Though Core asserts these two sentences are two alternative definitions, this is not a case such as *Abbott Labs*. In *Abbott Labs* the patentee described a term ("analyte") at the beginning of a passage to "refer" to not only a "chemical moiety for which analysis is desired, but also to chemical moieties that are reaction products" and then, after discussion, concluded the passage with a broader meaning in which the term "refers to any chemical moiety which is to be measured quantitatively." *See Abbott Labs.* 334 F.3d at 1354-55. Here, the passage in question provides one unified definition in the first two sentences. As to the last sentence, the Court notes that the negative limitation describes what an "idle screen" is <u>not</u>, as opposed to what an "idle screen" is. Neither party has identified how this sentence would be helpful in construing the term. Further, neither party has identified this sentence as being relevant to a dispute that would arise in the present case. The reference to "personal computers" has potential of causing jury confusion (the capabilities of personal computers have changed since the time of the patent) and does not appear to provide needed context to the earlier portions of the passage which reference a mobile telephone device and provide a clear reference to what an idle screen is.

**The Court construes "idle screen" to mean "The default screen displayed when the mobile telephone device is switched on and therefore capable of receiving a voice call. The idle screen is the screen which is displayed when the user is not navigating to a particular function, nor actively using a particular application, such as a contacts application, or a messaging application."**

## CONCLUSION

The Court adopts the above constructions set forth in this opinion for the agreed and disputed terms of the Asserted Patents. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 7th day of November, 2015.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE