**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| CORE WIRELESS LICENSING S.A.R.L., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 2:14-cv-911-JRG |
| | § | |
| LG ELECTRONICS, INC. AND LG ELECTRONICS MOBILECOMM U.S.A., INC., | § | |
| | § | |
| | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is LG's First Motion for Judgment as a Matter of Law, and in the Alternative for a New Trial (Non-Infringement) (Dkt. No. 451), LG's Second Motion for Judgment as a Matter of Law, and in the Alternative for a New Trial (Invalidity) (Dkt. No. 452), and LG's Third Motion for Judgment as a Matter of Law, and in the Alternative for a New Trial (Damages) (Dkt. No. 453). For the reasons set forth below, the Court finds that LG's motions for judgment as a matter of law, and in the alternative for a new trial, on the issues of infringement and validity should be **DENIED** (Dkt. No. 451; Dkt. No. 452). The Court finds that LG's motion for a new trial on the issue of damages should be **GRANTED** (Dkt. No. 453).

## I.     BACKGROUND

The Court held a jury trial in this case, and the jury returned a verdict on March 24, 2016. The asserted claims of U.S. Patent No. 8,434,020 ("the '020 Patent") and U.S. Patent No. 8,713,476 ("the '476 Patent"), the two patents-in-suit, relate to interface techniques used to access various functions of a mobile device application, and the accused products at trial were LG phones that implement the Android operating system. The jury's verdict found that the

asserted claims were infringed by LG's accused devices and not invalid, and it awarded $3.5 million in damages to Plaintiff Core Wireless Licensing S.a.r.l. ("Core"). ("Verdict," Dkt. No. 428.) Defendants LG Electronics, Inc. and LG Electronics MobileComm U.S.A., Inc. (collectively, "LG") now argue that the jury did not have sufficient evidence for its findings.

## II.    LEGAL STANDARD

### A.    Applicable Law Regarding FRCP 50

Upon a party's renewed motion for judgment as a matter of law following a jury verdict, the Court should properly ask whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." FRCP 50(b); *see also Am. Home Assur. Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirectV Group, Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). "A JMOL may only be granted when, 'viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion.'" *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).

Under Fifth Circuit law, a court is to be "especially deferential" to a jury's verdict, and must not reverse the jury's findings unless they are not supported by substantial evidence. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum,*

*Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A motion for judgment as a matter of law must be denied "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Baisden*, 693 F.3d at 498 (citation omitted). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 451 (5th Cir. 2013) (citation omitted). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151 (citation omitted).

## B.     Applicable Law Regarding FRCP 59

Under FRCP 59(a), a new trial can be granted to any party after a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FRCP 59(a). In considering a motion for a new trial, the Federal Circuit applies the law of the regional circuit. *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1347 (Fed. Cir. 2007). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610,

612–13 (5th Cir. 1985). "The decision to grant or deny a motion for a new trial is within the discretion of the trial court and will not be disturbed absent an abuse of discretion or a misapprehension of the law." *Prytania Park Hotel, Ltd. v. General Star Indem. Co.*, 179 F.3d 169, 173 (5th Cir. 1999).

## III.    INFRINGEMENT

To prove infringement under 35 U.S.C. § 271, a plaintiff must show the presence of every element, or its equivalent, in the accused product or service. *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985). First, the claim must be construed to determine its scope and meaning; and second, the construed claim must be compared to the accused device or service. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011) (citing *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)). "A determination of infringement is a question of fact that is reviewed for substantial evidence when tried to a jury." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007).

### A.    LG's Motion for JMOL Based on New Claim Constructions

At trial, Core asserted dependent claims 11 and 13 from the '020 Patent and dependent claims 8 and 9 from the '476 Patent. Independent claim 1 of the '020 Patent, on which claims 11 and 13 depend, provides as follows:

> A computing device comprising a display screen, the computing device being configured to display on the screen a main menu listing at least a first application, and additionally being configured to display on the screen an application summary window that can be ***reached directly*** from the main menu, wherein the application summary window displays a limited list of at least one function offered within the first application, each function in the list being selectable to launch the first application and initiate the selected function, and wherein the application summary window is displayed while the application is in an ***un-launched state***.

4

'020 Patent at col. 5, ll. 33–43 (emphasis added). Independent claim 1 of the '476 Patent, on which claims 8 and 9 depend, provides as follows:

> A computing device comprising a display screen, the computing device being configured to display on the screen a menu listing one or more applications, and additionally being configured to display on the screen an application summary that can be ***reached directly*** from the menu, wherein the application summary displays a limited list of data offered within the one or more applications, each of the data in the list being selectable to launch the respective application and enable the selected data to be seen within the respective application, and wherein the application summary is displayed while the one or more applications are in an ***un-launched state***.

'476 Patent at col. 5, l. 59–col. 6, l. 3 (emphasis added).

On the first morning of trial, Core called Mr. Mathieu Martyn, the named inventor of the '020 and '476 Patents, as its first witness. During Core's direct examination and LG's cross-examination of Mr. Martyn, it became clear to the Court that a live claim construction dispute existed between the parties. *See* (3/21/2016 A.M. Trial Tr., Dkt. No. 433 at 103:13–105:14, 135:14–137:8.) After Mr. Martyn's testimony ended, the Court asked the parties whether an *O2 Micro* issue existed for the Court to resolve with regard to the claim terms "un-launched state" and "reached directly." *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351 at 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute."). While Core indicated that it did not think additional claim construction before the Court was necessary, LG disagreed. (3/21/2016 P.M. Trial Tr., Dkt. No. 434 at 3:5–4:1, 100:12–101:4.) LG admitted that it had previously believed an *O2 Micro* issue might arise during trial but had not brought this concern to the Court's attention. (*Id.* at 100:22–101:4.)

LG then asked the Court to revisit its *O2 Micro* concerns after the testimony of Core's infringement expert, Dr. Kenneth Zeger, and the Court agreed. (*Id.* at 4:1–23.) After observing

Dr. Zeger's testimony during Core's direct examination, *see* (*Id.* at 64:9–66:10), the Court determined that an *O2 Micro* situation requiring additional claim construction did, in fact, exist with regard to the terms "un-launched state" and "reached directly." (*Id.* at 101:8–16.) As a result, and because the parties did not raise this dispute with the Court before trial began, the Court then heard arguments and construed the disputed terms outside the presence of the jury.

To advance its position on the appropriate construction for "un-launched state," Core argued that "launched" and "un-launched" have opposite meanings, and "launched" is consistently equated with "displayed" in the patents' specifications and the file history. (*Id.* at 102:23–24, 103:6–7, 105:16–20.) Therefore, Core concluded, "un-launched" must mean something that is not displayed or visible to the user. (*Id.* at 105:5–6, 106:16–19.) As support for its construction, Core cited multiple references in the specification that indicate "launch" or "launched" relate to visibility. (*Id.* at 434 at 103:12–104:5.) Additionally, Core discussed portions of the file history where the applicant equated "displayed" with "launched" while distinguishing claims from the prior art. (*Id.* at 104:6–105:7 ("And it says: The applicant underlines that when the main menu of Figure 6A is displayed, that happens when the mail application has already been launched.").) Finally, Core pointed to Dr. Zeger's deposition testimony as further support for finding "launched" to mean "displayed." (*Id.* at 105:21–106:17 ("ANSWER: So it's either not executing code or not visible to the user. That's what unlaunched would be.").)

In response, LG briefly mentioned the treatment of "launched" and "un-launched" in the patents, but it spent the majority of its argument addressing multiple prior art references contained in the file history. (*Id.* at 107:18–23.) In doing so, LG focused primarily on the patent applicant's amendment in response to the Richard reference, which amendment added the

following limitation: "Wherein the application summary window is displayed while the application is in an un-launched state." (*Id.* at 108:8–21.) LG argued that, to distinguish its claimed invention from Richard, a windows-based user interface directed to moving between different launched (but not necessarily visible) applications, the applicant added the "un-launched state" limitation and represented that an application in an "un-launched state" was not running. (*Id.* at 111:4–14, 112:24–113:10.) Essentially, LG's contentions amounted to a disclaimer argument. Core strongly disagreed with LG's characterization of Richard and alleged that all launched applications in the Richard reference were visible and running. (*Id.* at 114:4–22.)

The Court carefully considered the specifications and the prosecution history, but it did not find that the applicant had clearly disavowed claim scope during prosecution. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) ("In addition to consulting the specification, we have held that a court 'should also consider the patent's prosecution history, if it is in evidence.' . . . Yet because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.") (citation omitted); *Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource"); *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009) (disavowal requires the patentee's statements in the specification or prosecution history to amount to a "clear and unmistakable surrender"); *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013) ("Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable."). Instead, the Court found support in the language of the

patents for equating "launched" with "displayed." *E.g.*, '020 Patent at col. 2, l. 66–col. 3, l. 2. This relation is consistent with a reasonable interpretation of the prosecution history in which the patentee argued that Richard only discloses a single launched and visible application consisting of multiple windows. *See* Application No. 10/343,333, Dec. 26, 2007 Reply and Amendment to Final Office Action at 9. Accordingly, the Court construed "un-launched state" as "not displayed." (3/21/2016 P.M. Trial Tr., Dkt. No. 434 at 120:11–12.)

After hearing arguments on "un-launched state," the Court next considered the term "reached directly." Core argued that the term should be given its plain and ordinary meaning, stating that "[t]he patent is agnostic about how you get there. The point is that you get there quickly and easily. . . . And it says you get there in one step. That's really what the issue is. It doesn't matter the mechanism." (*Id.* at 116:17–21.) In response, LG represented:

> Our position at this point, Your Honor, is that what "reached directly from the main menu" means is that it needs to be reached from the main menu without an intervening step. We're not trying to argue . . . that the patent specifies some particular way of doing that. What we're saying is it's directly from the main menu, it means from the main menu without an intervening step.

(*Id.* at 117:15–22.) LG later stated, "the construction we would like on 'reached directly' is 'without an intervening step.'" (*Id.* at 120:4–5.) Having considered the parties' arguments and the intrinsic record, the Court construed "reached directly" as "reached without an intervening step." (*Id.* at 120:12–14.)

In its present motion before the Court, LG argues that the "unlaunched state" claim limitation should have been construed to mean "not running" and that, under such construction, no reasonable jury could have found infringement. (Dkt. No. 451 at 2, "Infringement Motion.") LG also argues that the claim limitation requiring the application summary window to be "reached directly from the [main] menu" should have been construed to require user interaction

8

with the main menu and that, under such construction, no reasonable jury could have found infringement.[1] (*Id.*) The Court declines to revisit its claim construction rulings. First, a Rule 50 motion is an inappropriate vehicle for LG's re-urged and new claim construction arguments. Claim construction is a matter of law and is not properly submitted to a fact-finder such as a jury.[2] Even if Rule 50(b) was a proper vehicle to raise claim construction issues, LG did not preserve its claim construction arguments in its Rule 50(a) motion (Dkt. No. 423). LG's Rule 50(a) motion does not mention its proposed construction of "reached directly from the main menu," and LG points only to a single footnote in its Rule 50(a) motion addressing "unlaunched state."[3] Accordingly, the Court finds that LG's motion for judgment of noninfringement as a matter of law based on new claim constructions should be denied. *Medisim Ltd. v. BestMed, LLC*, 758 F.3d 1352, 1356–57 (Fed. Cir. 2014) ("Rule 50(a) allows a party to challenge the sufficiency of the evidence prior to submission of the case to the jury. *See* Fed. R. Civ. P. 50(a). Rule 50(b), by contrast, sets forth the procedural requirements for renewing a sufficiency of the evidence challenge after the jury verdict. *See id.* 50(b). . . . These two provisions are linked together, as '[a] motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury.'" (citation omitted)); *see also SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312 (Fed. Cir. 2006) (arguments raised in footnotes are not preserved).

---

[1] The Court notes that LG now attempts to challenge the precise claim construction for "reached directly" which LG requested and received when the Court construed this term.

[2] LG seems to recognize this procedural reality, as it states in its reply brief: "Claim construction is a matter of law, so LG was not required to present its claim construction arguments as part of its Rule 50 motions to preserve its position." ("Reply," Dkt. No. 470 at 5.)

[3] That footnote provides: "LG objects to the Court's construction of 'un-launched state,' which is directly contrary to the plain and ordinary meaning of the term in the context of the asserted claims and the file history of the patents-in-suit. LG further objects to the claim constructions contained in Magistrate Judge Payne's Claim Construction Order (Dkt. 386) and this Court's adoption of that Order (Dkt. 417) over LG's prior objections for the reasons stated and referenced therein." (Dkt. No. 423 at 3, n2.) LG also included a short offer of proof in its Rule 50(a) motion related to "un-launched state," but it does not now contend that such paragraph preserved its arguments for its Rule 50(b) motion.

**B.      LG's Motion for JMOL Based on the Court's Claim Construction**

LG next argues that, even under the Court's construction of "reached directly," no reasonable jury could have found "that the accused notifications were 'an application summary window that can be reached directly from the main menu.'" (Infringement Motion at 22.) As such, LG contends that the Court should grant judgment of noninfringement as a matter of law.

The thrust of LG's noninfringement argument is that "it was undisputed [at trial] that the accused notifications are part of a notification shade that was accessed by swiping down on the status bar, not by interacting with a 'main menu.'" (*Id.* at 22–23.) LG asserts that since the evidence at trial established the status bar as distinct from a main menu, no reasonable jury could have found that the accused notifications could be reached from the main menu without using the status bar as an intervening step. (*Id.* at 23.) In response, Core argues that the jury reasonably concluded that the status bar is part of the main menu: "[t]he jury could reasonably conclude that, by pulling a notification shade down from the status bar part of the home screen, the user was interacting with the main menu." (Dkt. No. 460 at 8, "Infringement Response.")

At trial, Dr. Zeger testified that the accused LG products met this limitation:

QUESTION: Okay. Element [1c], do you see Element [1c], which reads: Additionally being configured to display on the screen an application summary window that can be reached directly from the main menu?

ANSWER: Yes, I do.

QUESTION: Does the LG G4 satisfy Element [1c]?

ANSWER: Yes, it does.

QUESTION: Can you show us the application summary window on the G4?

ANSWER: Yes. It's—the application summary window we pull down with our finger. This is an illustration, and the application summary window is just this white rectangle part of what we pulled down. And so there it is. That's the application summary window.

QUESTION: Is the application summary window reached directly from the main menu?

ANSWER: Yes, it is. It was reached—we were looking at the main menu, and we just immediately, in one step, were able to get it.

(3/21/2016 P.M. Trial Tr., Dkt. No. 434 at 53:25–54:12, 54:18–22.) On cross-examination, LG questioned Dr. Zeger at length on this issue:

QUESTION: And it's your opinion that the notification that we were looking at, which notifications for Gmail, et cetera, that you showed the jury, are reached directly from the main menu as shown on the screen, correct?

ANSWER: So using the claim construction that the Court just handed me, that is correct. Reached directly in the sense that they're reached without an intervening step.

. . .

QUESTION: So you're saying that you reached that particular notification directly from the main menu, because when you reach up here to the top of the screen and you swipe down, you get to it, right?

ANSWER: That's right. There's no intervening step.

QUESTION: Right. So, in your opinion, the act of pulling down from the status bar to show a notification shade is not an intervening step, in your opinion, right?

ANSWER: That's right. It's just one step.

(*Id.* at 134:21–135:2, 135:20–136:4); *see also* (*Id.* at 138:19–139:2, 140:14–141:31, 146:19–147:4.)

Additionally, LG called Dr. Daniel Sandler, a senior staff software engineer from Google, to discuss his interpretation of a home screen on LG's devices. (3/22/2016 P.M. Trial Tr., Dkt. No. 437 at 69:8–25.) LG then called its invalidity expert, Dr. Vernon Thomas Rhyne.

Significantly, Dr. Rhyne admitted on cross-examination that a user manual[4] for one of LG's accused products appears to show the status bar as an element included in the product's home screen. (*Id.* at 162:16–164:12.) Dr. Rhyne then agreed that if the status bar was considered part of the home screen, such assumption would affect his opinion "about whether or not you can get to the application summary window directly from the home screen." (*Id.* at 164:14–18.)

The Court is not persuaded by LG's argument that no reasonable jury could have found that the accused notifications were reached "without an intervening step" from the main menu. As the parties' briefing on this motion indicates, factual disputes between the parties and their witnesses existed at trial as to the correct meaning and representation of "home screen" in accused LG products and its relationship to a "main menu," as well as to whether accessing the status bar on the accused devices constitutes an "intervening step." In resolving these disputes, the jury was properly instructed on the law and was free to judge the credibility of witnesses and weigh all competing evidence, which included evidence that the accused LG devices satisfy every claim limitation of the patents. Given such support in the record, the Court will not supplant the judgment of the jury. The jury, acting under a preponderance of the evidence standard as to the disputed factual issues, unanimously reached a reasoned and supportable decision. Where a jury is presented with two conflicting positions at trial and there is reasonable evidence and argument to support both positions, the fact that the jury ultimately sided with one party over the other does not support entry of JMOL. Accordingly, the Court finds that LG's motion for judgment of noninfringement as a matter of law based on the Court's claim constructions should be and is **DENIED**.

---

[4] After losing its non-infringement argument at trial, LG now deems this user manual "legally irrelevant." (Infringement Motion at 22.) The Court finds that LG provides no legal support for this (new post-verdict) contention.

## C.     LG's Motion for New Trial

Finally, LG asserts that it is entitled to a new trial for four reasons. LG first re-urges its JMOL arguments and then contends that the Court's claim constructions were prejudicial. (Infringement Motion at 23.) The Court has already addressed each of those matters and, as such, finds that LG's request for a new trial on those bases should be and is **DENIED**.

Additionally, LG argues that the Court "made incorrect evidentiary rulings that prejudiced LG." (*Id.* at 23–24.) Namely, LG states, "the Court precluded LG from cross-examining Dr. Zeger and other witnesses regarding their inconsistent statements, and relevant portions of the file history." (*Id.* at 23.) The Court disagrees that LG suffered any prejudice, and a close examination of the trial transcript reveals that the "evidentiary rulings" now cited by LG actually precluded LG from doing very little. LG first argues that the Court limited the scope of LG's cross-examination of Dr. Zeger. (*Id.*) However, the portion of the transcript to which LG refers reveals that the Court simply instructed LG's counsel that he was "not going to go behind the claim construction," and LG's counsel agreed. (3/21/2016 P.M. Trial Tr., Dkt. No. 434 at 142:7–144:12.) The Court then noted that there was not a clear objection to rule on and "[w]e'll see where this testimony takes us." (*Id.* at 144:13–23.) LG next criticizes an instruction given by the Court that the parties should not use the file history to go behind the Court's claim constructions (an instruction LG's counsel readily agreed to when given), and points to an objection the Court sustained after LG's line of questioning ventured far outside of LG's previously stated bounds. (3/22/2016 P.M. Trial Tr., Dkt. No. 437 at 105:13–106:4, 112:7–114:2.) LG last argues that the Court "*sua sponte*" precluded "LG's rebuttal to Core's attempts to establish the validity of the patent" by referencing the length of time the asserted patents were prosecuted at the PTO. (Infringement Motion at 23.) In fact, the Court actually ruled that LG

could not collaterally attack the PTO and then declined to strike the testimony that LG had already elicited. (3/23/2016 A.M. Trial Tr., Dkt. No. 439 at 15:11–18:18.) Accordingly, the Court finds that LG's third argument for a new trial mischaracterizes the Court's actions as unduly prejudicial and finds that LG's request for a new trial on such bases should be and is **DENIED**.

Finally, LG contends that it is entitled to a new trial because the Court did not allow LG to call Dr. Mark Mahon, Core's validity expert, as an adverse witness. (Infringement Motion at 24–25.) During the course of trial, Core determined that it was no longer necessary to call Dr. Mahon in rebuttal as to the validity of the '020 and '476 Patents. (3/23/2016 A.M. Trial Tr., Dkt. No. 439 at 99:13–16.) After learning this strategic decision, LG moved to call Dr. Mahon adversely. The Court found that LG "had one of the most experienced invalidity experts in the nation testify at length" and had not been deprived of putting forth their invalidity case to the jury in any way. (3/23/2016 P.M. Trial Tr., Dkt. No. 441 at 5:12–20.) The Court then determined that it was not proper to permit LG to call Dr. Mahon adversely, noting potential problems with both qualifying Dr. Mahon as an expert and the jury's perception of Core's decision to not call Dr. Mahon to testify. (*Id.* at 5:21–6:3.) The Court concluded that allowing LG to call Core's validity expert adversely would effectively prejudice Core for electing not to present him in its rebuttal case. (*Id.* at 6:4–14.) LG now presents no compelling argument or authority to the contrary.[5] As such, the Court finds that LG's request for a new trial on this basis should be and is **DENIED**.

---

[5] It is also noteworthy that Dr. Mahon was not included on LG's Trial Witness List. (Dkt. No. 414-2.) This was an independently proper basis to exclude him regardless of any issue of potential prejudice.

# IV. VALIDITY

An issued patent is presumed valid. 35 U.S.C. § 282; *Fox Grp., Inc. v. Cree, Inc.*, 700 F.3d 1300, 1304 (Fed. Cir. 2012). LG has the burden to show by clear and convincing evidence that the asserted claims were anticipated by or obvious over the prior art. *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011). Anticipation is a factual question reviewed for substantial evidence. *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1323 (Fed. Cir. 2014). "A claim is anticipated only if each and every element is found within a single prior art reference, arranged as claimed." *Id.*

## A. LG's Motion for JMOL

LG argues that it is entitled to judgment as a matter of law on the issue of invalidity "because LG established that the Asserted Claims are anticipated by U.S. Patent No. 6,415,164 issued to Blanchard (LGX065) ("Blanchard"), and Core provided no rebuttal evidence." (Dkt. No. 452 at 1, "Validity Motion.") While LG presented testimony from Dr. Rhyne, who told the jury that Blanchard disclosed all of the limitations of the asserted claims, *see* (3/22/2016 P.M. Trial Tr., Dkt. No. 437 at 115:5–139:14), Core elected not to call its own validity expert in rebuttal. The underlying theme of LG's argument suggests that the jury had no choice but to believe Dr. Rhyne's conclusion that the asserted claims were invalid over Blanchard since Core chose not to present a rebuttal validity expert. (*Id.* at 2.)

In its present motion, LG summarizes and re-urges Dr. Rhyne's trial testimony (*Id.* at 5–11.) LG then alleges that Core presented only "two arguments to suggest that *Blanchard* did not anticipate the Asserted Claims: (1) *Blanchard* did not permit a user to send a text message in just one step; and (2) *Blanchard* did not bring the 'cream' of an application to the top or put 'everything in one place.'" (*Id.* at 11.) LG contends that the first argument is irrelevant to

anticipation because "reaching a specific function in 'one step' is not a claim limitation. Rather, the Asserted Claims, as construed by the Court, require that the application summary window be reached from the main menu without an intervening step." (*Id.* at 13.) LG also contends that the second argument focuses on features that are not claim limitations, as the asserted claims require only a limited list of functions or data, and "Core never asked for a construction of any claim term that suggested that the claims required listing the 'important functions' or the 'most useful data.'" (*Id.* at 15–16.) Thus, LG concludes that Core's arguments did not align with evidence that could support the jury's verdict.

In response, Core asserts that "LG's motion improperly seeks to shift the burden of proof regarding validity to Core Wireless" and emphasizes that the burden rests solely on LG to prove invalidity by clear and convincing evidence. (Dkt. No. 459 at 1, "Validity Response.") Core additionally argues that it rebutted LG's invalidity arguments through the testimony of the named inventor and its cross-examination of Dr. Rhyne, thus providing the jury with substantial evidence to find that its patents are not invalid. (*Id.*)

Core points to a portion of Dr. Rhyne's cross-examination where Dr. Rhyne admitted that the '020 and '476 Patents disclose a summary window of "a limited list of common functions and commonly accessed stored data." (3/23/2016 A.M. Trial Tr., Dkt. No. 439 at 30:3–17.) Dr. Rhyne then discussed the accessibility and visibility of certain application functions displayed in a menu of the Blanchard reference. (*Id.* at 31:9–32:6.) Core argues that the jury could have properly applied the plain and ordinary meaning of the claim terms "application summary" and "application summary window" to conclude that Blanchard failed to disclose those limitations: "[t]hat reference disclosed only a complicated menu structure (in *Blanchard*'s own terms, a set of 'selectable sub-level menu choices' col. 3 ll. 54-63, *see also id.* fig. 3) that did not provide

either an alternative way to access the application functionality or bring key functionality in a summary window." (Validity Response at 5.)

Additionally, Core argues, "the jury was not required to credit any of Dr. Rhyne's testimony at all, given that he was thoroughly and repeatedly impeached" and cites to multiple examples of such alleged impeachment. (*Id.* at 5–6 (citing 3/22/2016 P.M. Trial Tr., Dkt. No. 437 at 158:16–19; *Id.* at 161:15–17, 163:19–164:18; 3/23/2016 A.M. Trial Tr., Dkt. No. 439 at 25:8–26:15; *Id.* at 32:14–34:18).) Core then contends that "[a]bsent credible expert testimony explaining the Blanchard reference and the Martyn patents from the perspective of one skilled in the art," the jury was entitled to conclude that Blanchard on its face does not disclose several claim elements, including "application summary," "limited list," "sub-set of functions," and "unlaunched state." (Dkt. No. 482 at 1–2, "Validity Sur-Reply.")

The Court disagrees with LG's implication that the jury had no choice but to give full credit and acceptance to the testimony of Dr. Rhyne. The Court declines to improperly transform LG's burden of proving invalidity by clear and convincing evidence to a burden on Core to affirmatively prove validity. *See Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359–60 (Fed. Cir. 2007) ("Since we must presume a patent valid, the patent challenger bears the burden of proving the factual elements of invalidity by clear and convincing evidence. That burden of proof never shifts to the patentee to prove validity. 'The presumption [of validity] remains intact and [the burden of proof remains] on the challenger throughout the litigation, and the clear and convincing standard does not change.'" (citing *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986))); *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1570 (Fed. Cir. 1986) ("Under the law set by Congress, a jury or a court may reach a conclusion that a patent remains valid *solely* on the failure of the patent challenger's evidence to

convincingly establish the contrary. A patent being presumed valid at birth, § 282, a patentee need submit *no* evidence in support of a conclusion of validity by a court or a jury."). Having considered the entirely of the record, the Court concludes that LG failed to overcome the presumption of validity accorded to the '476 and '020 Patents by clear and convincing evidence and, as a result, finds that LG's motion for judgment of invalidity as a matter of law should be and is **DENIED**.

**B.      LG's Motion for New Trial**

LG requests a new trial for two reasons. First, LG re-urges it JMOL arguments. (Validity Motion at 16–17.) As the Court has already addressed such arguments, it declines to find that a new trial is warranted on that basis. Second, LG argues that "the Court made incorrect evidentiary rulings the prejudiced LG's ability to present its invalidity defenses." (*Id.* at 17.) Namely, LG points to the Court's exclusion of evidence regarding the Ericsson R380s Smartphone. (*Id.* at 17–18.)

Before trial, the Court excluded the Ericsson R380s Smartphone because LG failed to disclose the reference "at any time prior to Dr. Rhyne's expert report." (Dkt No. 421 at 7.) During trial, LG again raised the issue and argued that it should be able to introduce the R380s Smartphone because it was disclosed "at the same time in exactly the same manner" as the R380 reference, which was admitted. (3/22/2016 P.M. Trial Tr., Dkt. No. 437 at 62:4–5.) Further inquiry revealed the disclosure relied on by LG was actually a disclosure made by a different defendant in a different case. (*Id.* at 63:24–64:7.) The Court found that the R380s was not charted in LG's invalidity contentions or LG's IPR petition, and it was not listed in LG's prior art election. (*Id.* at 76:20–77:7.) Accordingly, the Court concludes that it was not erroneous to exclude evidence regarding the Ericsson R380s Smartphone. Additionally, the Court concludes

that its refusal to allow LG to expand the scope of cross-examination of Mr. Martyn in a manner inconsistent with its ruling excluding the R380s was not prejudicial error. (3/23/2016 P.M. Trial Tr., Dkt. No. 441 at 37:21–41:22.) As such, the Court finds that LG's motion for a new trial regarding invalidity should be and is **DENIED**.

## V.    DAMAGES

Upon a showing of infringement, a patentee is entitled to an award of damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. However, "[t]he burden of proving damages falls on the patentee." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). There are two alternative categories of damages typically recovered in a patent case: the patentee's lost profits or the "reasonable royalty [the patentee] would have received through arms-length bargaining." *Id.* In this case, Core sought a reasonable royalty.

To determine an appropriate reasonable royalty, patentees (and courts) commonly employ the hypothetical negotiation, or "willing licensor-willing licensee" model. *Id.* at 1324–25. The hypothetical negotiation "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began," assuming that the patent is valid, enforceable, and infringed. *Id.*; *see also Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n.13 (Fed. Cir. 1995) (en banc).

"[E]stimating a 'reasonable royalty' is not an exact science. As such, the record may support a range of 'reasonable' royalties, rather than a single value. Likewise, there may be more than one reliable method for estimating a reasonable royalty." *Apple Inc. v. Motorola, Inc.*, 757

F.3d 1286, 1315 (Fed. Cir. 2014). However, any method of estimating a reasonable royalty must adhere to the entire market value rule ("EMVR"), which requires that "[t]he patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features . . . [unless] the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." *Garretson v. Clark*, 111 U.S. 120, 121 (1884). Accordingly, proof of damages must be carefully tied to "the claimed invention's footprint in the market place." *VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014); *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) ("The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product."); *CSIRO v. Cisco Sys.*, 809 F.3d 1295 (Fed. Cir. 2015) ("damages awarded for patent infringement must reflect the value attributable to the infringing features of the product, and no more").

It is true that a reasonable royalty analysis "necessarily involves an element of approximation and uncertainty." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995). However, the Court must ensure that a jury's damages award is supported by substantial evidence. *Id.* Generally, the Court should uphold a jury's damages award "unless 'grossly excessive or monstrous,' clearly not supported by the evidence, or based only on speculation or guesswork." *Energy Transp. Group, Inc. v. William Demant Holding A/S*, 697 F.3d 1342, 1356 (Fed. Cir. 2012).

A.      **LG's Motion for New Trial**

At trial, Core based its damages analysis on the value of the Android operating system in LG's accused products at the time of an April 2013 hypothetical negotiation, and it presented its

damages theory through the testimony of Dr. Stephen Magee. Dr. Magee explained to the jury that he had "not seen any evidence" related to the cost of the Android operating system. (3/22/2016 A.M. Trial Tr., Dkt. No. 435 at 93:11–16 (Magee).) Instead, he used an estimated value of the non-accused Windows Mobile operating system as a substitute for determining the approximate value of the accused Android operating system. (*Id.* at 93:5–94:4.) Based on his calculations regarding Windows Mobile, through which Dr. Magee determined that $2.97 "is the marginal profit on the smallest salable unit," Dr. Magee concluded that the correct royalty rate would fall "somewhere between zero and $2.97." (3/22/2016 A.M. (Sealed) Trial Tr., Dkt. No. 436 at 4:12–13, 5:7–13 (Magee).) After establishing that range, Dr. Magee started from zero and "inched up" by two five-cent increments until he landed on what he believed to be "a reasonable number." (3/22/2016 A.M. Trial Tr., Dkt. No. 435 at 117:5–12, 118:2–7 (Magee).) Accordingly, Dr. Magee opined that ten cents was an appropriate royalty rate for each cell phone sold by LG that infringed the '020 and '476 Patents. (3/22/2016 A.M. Trial Tr., Dkt. No. 435 at 65:4–9.) Dr. Magee then multiplied that royalty rate by LG's sales of 35,219,051 allegedly infringing phones to arrive at around $3.5 million in total damages. (*Id.* at 78:17–79:3.)

LG now asserts that Core did not present sufficient evidence to support the jury's damages award and asks the Court to institute a new trial on damages or offer a remittitur. LG contends that the cost Dr. Magee assigned to the Windows Mobile operating system "was not an appropriate proxy for the free Android operating system used in the accused products," and "Dr. Magee did not apportion correctly for the incremental profit associated with the claimed invention." (Dkt. No. 453 at 2, "Damages Motion.") The Court agrees.[6]

---

[6] LG also argues that Dr. Magee did not tie his damages calculation to the invention's footprint in the market and ignored all prior licenses to the asserted patents. (Damages Motion at 2.) Given that the Court concludes that a new trial on damages is warranted absent such findings, the Court declines to address those arguments.

1. **The Windows Mobile Operating System**

LG argues that no reasonable jury could have found the Windows Mobile operating system to be an appropriate substitute for the Android operating system. (Damages Motion at 2.) LG offers three arguments in support of its contention that the evidence submitted at trial revealed such substitution to be inappropriate. First, LG argues that "Core's substitute cost for the accused operating system [was] not based on evidence contemporaneous with the April 2013 hypothetical negotiation date." (*Id.* at 4.) Instead, Dr. Magee assigned a value to the Windows Mobile operating system based solely on a 2008 magazine article. (*Id.*) On cross-examination, LG questioned Dr. Magee about the evidence he considered in forming his conclusion:

> QUESTION: So, Dr. Magee, your opinion relies in a significant part on the assumption that you can attribute a 2008 price for the Windows operating system to the free Android operating system, correct?
>
> ANSWER: Correct.
>
> QUESTION: As you sit here today, are you aware of any evidence that the Windows operating system was not free in 2013?
>
> ANSWER: I don't know the answer to that question as to when it was and was not free. I don't know.
>
> QUESTION: I heard you mention a 2008 *CNET* article as the basis for your statement that the Windows operating system costs around $14. Do I have that right?
>
> ANSWER: I inferred from it $11.50.
>
> QUESTION: Okay. And that *CNET* article—*CNET* is a magazine, right?
>
> ANSWER: Yes, sir.
>
> QUESTION: Okay. So from—do you have any other basis for your assessing the cost of the Windows Mobile operating system at $12, 11.57, do you have any other basis other than that article?
>
> ANSWER: Not that I recall, no, sir.

QUESTION: Do you have . . . any other way of assessing the value of the Android operating system as a component of an LG smartphone?

ANSWER: No, sir.

QUESTION: And you did hear Dr. Nafei's testimony that—that in his entire career at LG, the Windows Mobile operating system has been free?

ANSWER: I heard that testimony, yes, sir.

QUESTION: Does it affect your opinion at all?

ANSWER: No, sir.

(3/22/2016 P.M. Trial Tr., Dkt. No. 437 at 35:15–36:19.) Additionally, LG notes that Core did not offer the 2008 article into evidence for the jury to consider, and Dr. Magee did not testify regarding the article's relevance to the 2013 hypothetical negotiation date.[7] (Damages Motion at 5.)

Second, LG argues that both the Android and Windows Mobile operating systems were cost-free in April 2013, and Core offered no evidence to the contrary. (*Id.* at 6.) As demonstrated by his above-cited testimony, Dr. Magee admitted that he did not know whether the Windows Mobile operating system was free to LG in 2013 and had not considered that fact when applying Windows Mobile's purported 2008 cost to arrive at a 2013 value for the Android operating system. (*Id.*)

Finally, LG asserts that "Core presented no evidence that the Windows Mobile operating system uses the asserted patents." (*Id.*) At trial, Dr. Magee did not compare the Windows Mobile operating system to the accused products and instead stated that he had no knowledge of whether Windows Mobile included the accused features:

---

[7] When asked on re-direct examination why he believed it was appropriate to rely on the 2008 article as the entire basis for valuing Windows Mobile, Dr. Magee stated: "Because we had a price in 2008 for sort of a range of prices that gave a value of $11.50 for what, on the market, it would cost to get the Windows Mobile operating system." (3/22/2016 P.M. Trial Tr., Dkt. No. 437 at 51:18–23.)

QUESTION: You also don't know if the accused feature is present in the Windows Mobile operating system, right?

ANSWER: Correct.

. . .

QUESTION: Okay. And you don't know if Microsoft is actually using anything described in the patent in the Windows Mobile operating system, correct?

ANSWER: I don't know that—whether it is or is not, that's correct.

(3/22/2016 P.M. Trial Tr., Dkt. No. 437 at 24:22–24, 26:4–8.) As such, LG concludes that, based on Dr. Magee's opinions and the evidence Core presented at trial, no reasonable jury could have found Dr. Magee's proposed value of the Android operating system and accompanying ten-cent royalty rate to be appropriate benchmarks for determining damages. (Damages Motion at 7.)

In response, Core disagrees with LG's objections to the 2008 *CNET* article and argues that Dr. Magee could rely on what he considered to be the best estimate of the Windows Mobile operating system: "[t]he propriety of this reliance is not undermined by either the date of the article nor the article's not being admitted into evidence." (Dkt. No. 461 at 3, "Damages Response.") Core then states that "all that remains of LG's argument are the bare assertions that Android was free to LG, and that Windows Mobile might have been free to LG. But the jury could reasonably reject LG's simplistic argument that 'free to LG' equals 'valueless.'" (*Id.* at 4.)[8] Finally, Core contends that Dr. Magee was not required to compare the features of Windows Mobile with those of the patents-in-suit: "Dr. Magee was not required to do more than rely on the fact that LG had sold phones with the Windows Mobile Operating system and that both Windows and Android were mobile operating systems." (*Id.* at 5.)

---

[8] The Court notes that Core seems to have misunderstood LG's argument. Indeed, LG notes in its Reply brief, "Core's Opposition mischaracterizes LG's argument as an argument that has no value. That is not the case . . . Android has value, but Dr. Magee's methodology for determining that value, and for determining the value of the patented features allegedly within Android, was speculative and divorced from the facts of the case." (Dkt. No. 472 at 1, "Damages Reply.")

The Court finds that Dr. Magee did not adequately tie his analysis to the 2013 hypothetical negotiation date. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012) (finding the purpose of the hypothetical negotiation framework to be "discern[ing] the value of the patented technology to the parties in the marketplace when infringement began"). While Dr. Magee admitted that he relied solely on a 2008 magazine article as his basis for estimating the cost of the Windows Mobile operating system, he failed to offer sufficient testimony explaining how the 2008 cost would compare, relate, or remain relevant to the 2013 negotiation.

Additionally, the Court finds Dr. Magee's opinion that the Windows Mobile operating system could serve as an acceptable substitute for valuing the Android operating system to be conclusory and wholly unsupported by the evidence. The Windows Mobile operating system is clearly not the smallest salable patent practicing unit, as there is no evidence that it practices the patent and it was not an accused product at trial. At best, its alleged 2008 cost is roughly analogous to a comparable license. However, Dr. Magee did not testify as to whether Windows Mobile is technologically or economically comparable to Android, and he failed to account for any differences between the two products.[9] *See VirnetX*, 767 F.3d at 1330 ("In *ResQNet*, we faulted the district court for relying on licenses with 'no relationship to the claimed invention,' nor even a 'discernible link to the claimed technology.' And in *Lucent*, we rejected reliance on licenses from 'vastly different situation[s]' or where the subject matter of certain agreements was not even ascertainable from the evidence presented at trial.") (citing *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010) and *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009)); *Carnegie Mellon Univ. v. Marvell Tech. Group, Ltd.*, 807 F.3d 1283,

---

[9] The Court notes that Core does not point to any evidence in the record where Core compared the Windows Mobile operating system to the accused features of the Android operating system.

1304 (Fed. Cir. 2015) ("Past licensing practices of the parties and licenses for similar technology in the industry may be useful evidence. But such evidentiary use must take careful account of any economically relevant differences between the circumstances of those licenses and the circumstances of the matter in litigation.") (citations omitted); *SSL Servs., LLC v. Citrix Sys.*, 769 F.3d 1073, 1093 (Fed. Cir. 2014) ("[T]he court found the agreements 'sufficiently comparable to be probative of the hypothetical negotiation' as they involve the actual parties, relevant technology, and were close in time to the date of the hypothetical negotiation. . . . SSL's expert expressly addressed the differences between the license negotiations and any hypothetical negotiations, thereby clarifying for the jury where such differences might exist and the limited value of such evidence.") (citations omitted). Absent such testimony, the Court concludes that Core failed to offer sufficient evidence for the jury to find that Windows Mobile is an acceptable economic substitute or that it bears any relationship to "the incremental value that the patented invention adds to the end product." *Ericsson*, 773 F.3d at 1226; *see also ResQNet*, 594 F.3d at 869 (holding that "[a]ny evidence unrelated to the claimed invention does not support compensation for infringement").

### 2. Dr. Magee's Apportionment

LG next argues that Dr. Magee failed to properly apportion the value of the patented feature because he implemented "an unsubstantiated $0.05 per unit royalty floor" and "improperly invoked the entire market value rule." (Damages Motion at 7.) First, LG contends that Dr. Magee provided insufficient justification for employing increments of five cents in calculating a royalty rate. At trial, Dr. Magee discussed his implementation of five-cent units:

QUESTION: Returning now to your royalty range, what was your starting point in this range to determine the appropriate royalty?

ANSWER: Well, I started at zero and worked up from there.

. . .

QUESTION: What amount more than zero did you start with in analyzing the appropriate royalty here on this range?

ANSWER: Well, I started at zero and said: Okay. How much do we come up? There is—I've seen evidence in—in royalty agreements and so forth that 5 cents is sort of—per phone or per unit would be a typical unit to use in—in changing rates. So I inched up from a dollar—sorry—from zero dollars to 5 cents. That's a first step.

. . .

QUESTION: Okay. What did you think about the 5 cents?

ANSWER: Well, remember the hypothetical negotiation says we're allowed to consider everything and anything. And the most important thing is: What's the reasonable number? And I think 5 cents just would not be a reasonable number. It has to be a number that would be reasonable both for Core Wireless and for LG. It would certainly be a great number for LG, but I don't think it would be reasonable. And I would—if I were Core Wireless, I certainly wouldn't accept 5 cents.

QUESTION: So what amount more than 5 cents did you then consider?

ANSWER: Well, let's take another 5-cent increment. If we add another 5 cents, we go up to 10 cents. And then we draw the line and we say, again, is this a reasonable number? And—but for a number of reasons, I think that's the number I rested on.

(3/22/2016 A.M. Trial Tr., Dkt. No. 435 at 116:16–118:6.) Dr. Magee explained that he stopped

at ten cents for "reasons . . . about being conservative," though he never fully developed those

reasons for the jury. (*Id.* at 120:9–16 (Magee).) LG notes that Dr. Magee never identified the

purported royalty agreements containing five-cent units "or whether they involved comparable

parties, technology, or products." (Damages Motion at 8.) Moreover, LG points to testimony

where Dr. Magee acknowledged that licenses in the mobile phone industry commonly include

per-unit royalty rates of one-tenth of a cent or less and then admitted that he instead chose to start

at an increment of five cents because he was "relying on one patent pool license" that did not include the patents-in-suit. (3/22/2016 P.M. Trial Tr., Dkt. No. 437 at 38:24–40:5.)

Additionally, LG contends that "Dr. Magee further erred in basing his theory on the average sale price of the entire phone." (Damages Motion at 9.) When LG questioned Dr. Magee about whether he had analyzed consumer demand for specific patented features or conducted consumer surveys, Dr. Magee responded that he had not. (*Id.*) However, LG argues that "[d]espite Dr. Magee's admissions, he presented the average sale price of the entire phone to the jury, in violation of the entire market value rule." (*Id.*)

In response, Core concedes that Dr. Magee discussed and displayed the average price of a smartphone but argues that such presentation did not invoke the entire market value rule. (Damages Response at 6.) Core asserts, "Dr. Magee referred to the average price of a phone in order to explain that he is not invoking the entire market value rule—*i.e.*, to show that the estimated cost of the operating system or estimated marginal profits of the operating system are not the same as the average cost of the phone." (*Id.*) While displaying the price of the phone, Dr. Magee testified that "we're not using the 258-dollar average price of the phone. We're not using the profits on the entire phone. We're only going to use the profits down at the very bottom." (3/22/2016 A.M. (Sealed) Trial Tr., Dkt. No. 436 at 4:1–3.) Additionally, Core argues that Dr. Magee arrived at a ten-cent royalty rate based on his analysis of the *Georgia-Pacific* factors and alleges that LG's criticism of Core's royalty rate "goes to the weight of Dr. Magee's testimony." (Damages Response at 7–8.)

Having considered the entirety of the record, the Court does not find that sufficient evidence supports the jury's damages verdict. While Dr. Magee did indeed discuss the *Georgia-Pacific* factors and testify that certain features of the patented technology should lead to a higher

royalty rate, the Court agrees with LG that Dr. Magee did not present adequate justification or evidence for adjusting the royalty rate by increments of five cents. Moreover, the Court finds that Dr. Magee exacerbated this problem by ultimately arriving at a ten-cent royalty rate without providing a logical opinion supported by evidence for stopping at that increment. *See* (3/22/2016 P.M. (Sealed) Trial Tr., Dkt. No. 438 at 8:7–10:12.) The Court concludes that such an approach is fundamentally arbitrary and analogous to other "rule of thumb" valuation practices the Federal Circuit has consistently rejected. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1311–18 (Fed. Cir. 2011) ("Gemini then applied the so-called '25 percent rule of thumb,' hypothesizing that 25% of the value of the product would go to the patent owner . . . it is clear that Gemini's testimony was based on the use of the 25% rule of thumb as an arbitrary, general rule, unrelated to the facts of this case.); *VirnetX*, 767 F.3d at 1332–33 ("[W]e agree with the courts that have rejected invocations of the Nash theorem without sufficiently establishing that the premises of the theorem actually apply to the facts of the case at hand. The use here was just such an inappropriate 'rule of thumb.' . . . Such conclusory assertions cannot form the basis of a jury's verdict."). The Court is also aware of the potential prejudice inherent in Core's decision to show the jury the entire average price of a smartphone while Dr. Magee simultaneously presented his smaller damage calculations in comparison. *See CSIRO*, 809 F.3d at 1302 (There is an "'important evidentiary principle' that 'care must be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product.' . . . disclosure of the end product's total revenue 'cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.'") (citations omitted). Accordingly, and for the reasons stated above, the Court finds that LG's motion for a new trial on the issue of damages should be and is **GRANTED**.

## VI. CONCLUSION

For the reasons set forth above, the Court finds that the jury's verdict with regard to infringement and validity should not be disturbed. The jury's verdict in those respects is supported by substantial evidence. However, the Court finds that LG is entitled to a new trial on damages. Accordingly, LG's First Motion for Judgment as a Matter of Law, and in the Alternative for a New Trial (Non-Infringement) (Dkt. No. 451) and LG's Second Motion for Judgment as a Matter of Law, and in the Alternative for a New Trial (Invalidity) (Dkt. No. 452) are **DENIED**. LG's Third Motion for Judgment as a Matter of Law, and in the Alternative for a New Trial (Damages) (Dkt. No. 453) is **GRANTED**.

**So ORDERED and SIGNED this 23rd day of August, 2016.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE